**IN THE SUPREME COURT OF MISSISSIPPI**
**NO. 2000-CA-00891-SCT**

*APAC-MISSISSIPPI, INC.*

*v.*

*JAMES LEE GOODMAN*


| | |
|---|---|
| DATE OF JUDGMENT: | 04/06/2000 |
| TRIAL JUDGE: | HON. FRANK G. VOLLOR |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT L. WELLS |
| | ERIN SETNIKAR CHRIST |
| ATTORNEYS FOR APPELLEE: | PAUL KELLY LOYACONO |
| | EVERETTE VERHINE |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED FOR NEW TRIAL - 01/10/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 1/31/2002 |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**


**INTRODUCTION**

¶1. B.A.S., the general contractor for the construction of the Junction Shopping Center in Jackson, Hinds County, Mississippi, entered into a subcontract with APAC-Mississippi, Inc., for the installation of the shopping center's asphalt parking lot. APAC decided to spread hydrate lime over the soil for stabilizing purposes prior to laying the asphalt, so it contracted with Falco Lime, Inc., to deliver and spread the lime as directed by APAC. APAC had the option to spread the lime itself, but its usual business practice was to, as in this case, require the lime supplier both to deliver and spread it.

¶2. Before sunrise, James Lee Goodman, a Falco employee, arrived at the work site with a truck load of lime. Goodman inspected the work site with an APAC employee who told Goodman where to spread the lime and how thickly to spread it. While returning to the truck, Goodman walked over part of the unfinished parking lot, including a muddy area which had previously been treated with lime by another Falco employee.[1] Goodman slipped and injured his knee. According to Goodman, the lime made the ground

unreasonably slippery and this condition caused the accident.

¶3. Goodman received workers' compensation benefits based on his employment with Falco. He then filed a complaint in the Circuit Court of Warren County, Mississippi, claiming that APAC was negligent by causing an unreasonably dangerous concealed condition, by allowing the unreasonably dangerous concealed condition to continue to exist, and by failing to warn Goodman of the condition.[(2)]

¶4. The jury returned a verdict in the amount of $400,000 in favor of Goodman. Feeling aggrieved, APAC has appealed, raising claims that the trial court erred in entering partial summary judgment in favor of Goodman, in making evidentiary rulings and in failing to order a remittitur. Because we find that the entry of partial summary judgment was inappropriate, we reverse and remand for a new trial.

## DISCUSSION

### I. WHETHER THE TRIAL COURT ERRED IN DENYING APAC'S MOTION FOR SUMMARY JUDGMENT AND GRANTING A PARTIAL SUMMARY JUDGMENT TO GOODMAN, A NON-MOVING PARTY.

¶5. APAC filed a motion for summary judgment claiming that, as Falco was a subcontractor of APAC, APAC was a statutory employer and was therefore immune from tort liability under Mississippi law. APAC further contended that Goodman's exclusive remedy was provided by the Mississippi Workers' Compensation Act. At the hearing on the motion for summary judgment, Goodman, for the first time, claimed that Falco was a materialman, not a subcontractor, and APAC therefore was not immune from tort liability as a statutory employer under the Act. Despite the fact that Goodman had not filed a motion for summary judgment and was only defending against APAC's motion, the trial court entered partial summary judgment for Goodman, finding that, as a matter of law, Falco was a materialman and not a subcontractor, and that the Act did not apply.

¶6. APAC requested the trial court to set aside the order granting partial summary judgment and allow the issue of whether Falco was a subcontractor or a materialman to go to the jury as a disputed issue of fact. The trial court refused to set aside its order and precluded APAC from offering evidence that it had contracted with Falco to provide labor (i.e., spreading the lime), thereby making Falco a subcontractor.

¶7. We conduct a de novo review of orders granting summary judgment and consider all the evidentiary matters before it - admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. *Aetna Cas. & Sur. Co. v. Berry,* 669 So. 2d 56, 70 (Miss. 1996). A motion for summary judgment may be granted only where there is no genuine issue of material fact; summary judgment is not a substitute for the trial of disputed facts. *Brown v. Credit Ctr., Inc.,* 444 So. 2d 358, 362 (Miss. 1984). Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. *Berry,* 669 So. 2d at 70.

¶8. In most cases where summary judgment is at issue, "[t]he evidence must be viewed in the light most favorable to the party against whom the motion has been made." *Id.* In those instances, "[a]ll that is required of a non-movant to survive a motion for summary judgment is to establish a genuine issue of material fact. . . ." *Simmons v. Thompson Mach. of Miss., Inc.,* 631 So. 2d 798, 801 (Miss. 1994).

### A. Whether the trial court erred in granting partial summary judgment to Goodman.

¶9. The grant of summary judgment for the non-moving party clearly is proper if both sides agree that there are no material fact issues and join in the request that the case be decided, for the moving or the non-moving side, on the basis of a motion for judgment made by only one of them. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 346 (1998)). *See also Galindo v. Precision Am. Corp.,* 754 F. 2d 1212, 1216 (5th Cir. 1985)); *Scottsdale Ins. Co. v. Deposit Guar. Nat'l Bank*, 733 So. 2d 863, 867 (Miss. Ct. App. 1999).

¶10. In *Scottsdale,* the only Mississippi case dealing with the propriety of granting summary judgment to a non-moving party, after one of the parties filed a motion for summary judgment and both of the parties submitted a "Stipulation of Fact and Waiver of Jury Trial," the trial judge made a determination of the legal effect of the agreed-upon facts. The Mississippi Court Appeals affirmed, finding that the non-moving party was entitled to judgment as a matter of law.

¶11. In the case sub judice, Goodman and APAC did not enter into a "Stipulation of Fact and Waiver of Jury Trial." It appears from the record that Goodman appeared at the hearing to defend against APAC's motion; however, the trial court not only denied APAC's motion, but entered partial summary judgment in favor of Goodman, even though the hotly contested issue of fact of whether Falco was a subcontractor or a materialman existed.

### B. Did the trial court err in denying APAC's motion for summary judgment?

¶12. Both parties agree that APAC was a subcontractor of B.A.S. Construction, and that APAC and Falco entered into a contract where Falco agreed to perform certain work that APAC had previously contracted to do for B.A.S. Under the APAC-Falco contract, Falco promised to deliver lime to the job site and to blow and spread the lime onto the area designated by APAC.

¶13. The parties further agree that, while touring the job site, Goodman injured his knee after walking through a patch of ground on which lime had been spread and which was wet. After Goodman was injured, another APAC employee offered to blow the lime for Goodman. However, Goodman refused, and only after completing the job, was he taken by ambulance to the hospital. Goodman sought and Falco paid workers' compensation benefits for the injury he incurred while working on the APAC work site.

¶14. The trial court, during the hearing on APAC's motion for summary judgment, made the following findings of fact and conclusions of law, summarized as follows:

A. Upon each delivery of lime to the work site, Falco issued documents entitled either "Straight Bill of Lading" or "Shipping Order," with each document stating: "Falco Lime is a material supplier. Our drivers deliver/spread this product under the customer's direction and supervision." These "Bills of Lading" and the language contained in them indicated that Falco considered itself to be a materialman and not a subcontractor.

B. Once a Falco driver entered upon APAC's work site, APAC employees instructed him where to place the lime and to what degree of thickness the lime was to be applied. After depositing the lime onto APAC's site, the Falco truck exited the job site and all work thereafter relating to the lime was performed by APAC employees.

C. Falco Lime was a materialman and that APAC was not a statutory employer, and therefore not shielded from liability under Mississippi's Workers' Compensation Act. The most efficient way to

spread the lime was by using a special tanker truck. Falco possessed such a truck, and APAC did not. All of the activities required in "installing" the lime, i.e., preparing the soil, mixing the soil and lime, adding water, compacting the soil and lime, and grading the area, were performed by APAC. Merely driving a tanker truck across a staked-out area and delivering lime at a set degree of thickness was not enough to convert Falco Lime from a materialman to a subcontractor. To adopt any other interpretation of the law to the facts would give too broad a reach to the definition of subcontractor such that it would subsume the meaning assigned to a materialman.

¶15. APAC argues that the undisputed facts showed that Falco was in fact a subcontractor of APAC, pointing out that we have previously defined a subcontractor as "one who enters into a contract, express or implied, for the performance of an act with a person who has already contracted for its performance, or who takes a portion of the contract from the principal or prime contractor." *Vance v. Twin River Homes, Inc.,* 641 So. 2d 1176, 1182-83 (Miss. 1994) (citations omitted).

¶16. While we have previously held that no rule can be laid down to determine the difference between a subcontractor and a materialman, general principles have evolved to aid in differentiating between the two. "[A] materialman may be distinguished from a contractor or subcontractor by the fact that he agrees only to furnish materials and not to install them or *do any work* in connection therewith." *Frazier v. O'Neal Steel, Inc.,* 223 So. 2d 661, 664 (Miss. 1969). "Generally, one who not only furnishes materials, but installs them, is a contractor or a subcontractor, and not a materialman." *Id.*

¶17. Goodman testified that in his 20 plus years of experience driving lime trucks, it was his routine upon arriving at a job site to park and wait for the job supervisor to get him and instruct him on what he needed to do. He stated, "The contractor will come get me and take me out there (to the job site) and show me what he wants me to do. I just can't go out there and walk out there and go to doing something. I have to wait until he (the supervisor) comes and gets me. I'm going to stay right to my truck until he come get me and show me what he want me to do, and I'll follow him." Therefore, Goodman, at least subjectively, believed that, upon arriving at a work site, he could act only under the control and direction of the job supervisor, and no longer was solely controlled by Falco.

¶18. Falco operated under the same impression. Joe Lambiotte, Falco's Chief Financial Officer, averred in an affidavit that, although no written contract existed between Falco and APAC, there was an oral contract between Falco and APAC that the required lime work was *subcontracted* out from APAC to Falco, such that Falco was responsible for supplying, delivering, blowing and spreading the lime on this particular job. He stated, "We have a long-standing relationship with APAC on jobs such as the one in dispute, and often no written contract are entered into," and, "It was understood that we (Falco) would be the 'subcontractors, ' doing the lime portion of APAC's contract. As such, we not only provide the lime, but our employees deliver, spread and blow the lime as well."

¶19. These statements may be considered a declaration against interest because, if Falco was determined not to be a subcontractor, it would be entitled to full reimbursement of the workers' compensation benefits paid to Goodman.

¶20. It is undisputed that Goodman only acted under the direction and supervision of an APAC employee, and, once instructed, actually spread the lime in accordance with APAC's specifications. This would indicate that some work, however small, was performed by Falco for APAC. We have held that one who contracts to supply materials processed especially for a contractor and in accordance with special reference

to the plans and specifications, falls within the definition ascribed to a subcontractor. *See O'Neal Steel Co. v. Leon C. Miles, Inc.,* 187 So. 2d 19, 25 (Miss. 1966).

¶21. As conflicting evidence was offered by both APAC and Goodman as to Falco's status, genuine issues of material fact were present, and summary judgment was not appropriate.

## II. WHETHER THE TRIAL COURT ERRED IN EXCLUDING FROM EVIDENCE A CERTAIN PHOTOGRAPH.

¶22. Goodman's entire case centered on the fact that he slipped on extra-slippery mud, a condition which was concealed and caused by APAC. APAC's defense was that Goodman's own negligence caused or contributed to his injuries, and, in furtherance of this defense, APAC offered a photograph (Exhibit 6) of the job site on the morning of the accident. Phillip Foreman, the job site general superintendent, testified that he took the photograph within minutes after Goodman's fall. The photograph showed the consistency of the mud that existed on the project that particular morning, the position of Goodman's truck on the job site, the areas where asphalt had previously been laid, the projected path that Goodman had traveled, as well as the accumulation of mud puddles due to rainfall the night before. The trial court excluded the photograph, ruling that it failed to show the exact spot where Goodman fell, and as such was irrelevant.[(3)]

¶23. APAC argues that the photograph had probative value because it would have assisted the jury in seeing the construction site as it existed the morning of the accident. APAC relies on M.R.E. 401 which defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Goodman responds that the trial court did not abuse its discretion in excluding the photograph as it did not provide any assistance to the jury.

¶24. The comment to M.R.E. 401 explicitly states that "if any evidence has probative value at all, the rule favors its admission." As the proffered photograph depicted the scene at the time of Goodman's accident, the trial court would have been justified in allowing it into evidence. *See Nelson v. Phoenix of Hartford Ins. Cos.,* 318 So. 2d 839, 843 (Miss. 1975). As such, the trial court committed error in excluding the photograph and APAC should have been allowed to demonstrate to the jury the open and obvious general conditions of the work site, but not to show where Goodman fell.

## III. WHETHER THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE EXPERT OPINION TESTIMONY REGARDING LOSS OF FUTURE INCOME.

¶25. Economist Dr. Charles Dennis testified as an expert witness about Goodman's loss of future income. A few weeks before trial, Goodman produced to APAC a spreadsheet showing Dr. Dennis's analysis and proposed testimony. After reviewing the spreadsheet, APAC requested that Goodman provide further facts to support Dr. Dennis's conclusions. Goodman failed to respond to this request until four days before trial when APAC was sent a page of "footnotes" which calculated Goodman's future lost income. These footnotes used the figure of $13,000 as a base salary.

¶26. Dr. Dennis presented new calculations of future lost income at trial because, as he explained during his testimony, counsel for Goodman presented him with a new figure for Goodman's base salary the night before. APAC objected to this testimony on two grounds: (1) Goodman did not produce the new calculations to APAC prior to trial, thereby violating the requirement of Miss. R. Civ. P. 26(f)(1)(B) to

supplement discovery responses by expert witnesses in a timely manner; and (2) Goodman did not provide a proper foundation for Dr. Dennis's calculations because Goodman never produced his 1999 income tax or wage information.

¶27. The trial court overruled APAC's objections, and Dr. Dennis testified that Goodman earned approximately $32,000 a year pre-injury and approximately $17,000 a year post-injury. Dr. Dennis testified that it was his opinion that Goodman had future lost wages totaling $218,250.

¶28. Goodman's current employer, Vicksburg Ready Mix, then produced Goodman's 1999 W-2 form which showed that Goodman actually earned $23,893.22 in 1999. As Dr. Dennis had been dismissed by the court, he was not available to be re-examined and did not have the opportunity to correct his prior analysis. APAC again requested that the court strike Dr. Dennis' testimony, as it was obviously incorrect, and again the trial court denied APAC's request.

¶29. APAC's primary objection to Dr. Dennis's testimony on loss of future income was that an adequate foundation for his testimony had not been made. The trial court overruled all of APAC's objections, granting only a continuing objection on the basis and source of the facts from which Dr. Dennis based his opinions. During APAC's case-in-chief, and after evidence had been submitted as to the correct amount of Goodman's 1999 wages, Goodman stipulated that the figure relied upon by Dr. Dennis for projecting future lost wages was incorrect. Goodman's counsel also admitted that he never verified Goodman's 1999 income and had only estimated that figure. Despite this admission, the trial court denied APAC's motion to strike Dr. Dennis's testimony.

¶30. The Court of Appeals, citing **Hickox v. Holleman**, 502 So. 2d 696, 638 (Miss. 1987), recently addressed what constitutes permissible facts upon which an expert may reasonably base his opinion:

> [U]nder the guidelines of the Mississippi Rules of Evidence Rule 702, the trial judge serves as a "gatekeeper" in ruling on the admissibility of expert testimony. The Supreme Court of Mississippi has advised that "[t]he facts upon which the expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture."

**Watkins v. U-Haul Int'l, Inc.,** 770 So. 2d 970, 974 (Miss. Ct. App. 2000) (citing **Hickox,** 502 So. 2d at 638). The facts relied upon "must afford a 'reasonably accurate basis' for the expert's conclusion." **Fielder v. Magnolia Beverage Co.,** 757 So. 2d 925, 937 (Miss. 1999).

¶31. The sole source for the data used in Dr. Dennis's calculations of loss of future income was Goodman's attorney, who admittedly estimated Goodman's wages for 1999. We therefore find that the data on which Dr. Dennis relied was not reasonably accurate and that his testimony should have been excluded by the trial court. The 1999 W-2 form conclusively demonstrates Goodman's 1999 income, and we can find no justification for the trial court's refusal to strike Dr. Dennis's testimony.

### IV. WHETHER THE TRIAL COURT ERRED IN ALLOWING PROOF ON AN ELEMENT OF DAMAGES NOT RAISED IN THE PLEADINGS.

¶32. During pre-trial motions, APAC successfully prevented Goodman from placing into evidence certain retirement benefits he would have received had he remained in the employment of Falco on the bases that Goodman had not previously claimed retirement benefits as an element of damages and that Goodman failed to provide or supplement this information previously through discovery.

¶33. During cross-examination of Larry Lambiotte, a co-owner of Falco, APAC asked what Goodman would be earning if he were still employed by Falco. After responding to APAC's question, Lambiotte further offered that the figure he offered did not include certain "fringe benefits." During re-direct, Goodman inquired into the "fringe benefits" mentioned by Lambiotte. APAC objected and requested that the court not allow Lambiotte to testify regarding retirement benefits. Goodman argued that as APAC had opened the door in its questioning of Lambiotte, he should be allowed to bring forth this information. The trial court overruled APAC's objection.

¶34. APAC argues that Lambiotte volunteered this information and it was not responsive to the question asked. Therefore, APAC contends that no door was opened, and its objection to the testimony should have been sustained.

¶35. This issues appears to be one of first impression in Mississippi. The Missouri Court of Appeals has ruled that, as a general rule, the issue of whether a party opens the door for an opposing party to inquire about otherwise inadmissible evidence, lies within the sound discretion of the trial court. *See **Duckett v. Troester,*** 996 S.W.2d 641, 649 (Mo. Ct. App. 1999). We find that the abuse of discretion standard is appropriate and that the trial court did not abuse its discretion in allowing the testimony as to "fringe benefits" into evidence.

## V. WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT APAC A NEW TRIAL AND/OR REMITTITUR.

¶36. After trial, counsel for APAC was approached by George Ferris, one of the jurors, who stated that, when the jury retired to the jury room, each of the twelve jurors decided upon a figure to compensate Goodman and wrote it down on a piece of paper. The numbers were added together and then divided by twelve to reach a base amount. A verdict arrived at by use of this method is called a "quotient verdict." The jury then added 40% for attorney fees. Another juror, Robert Van Norman, confirmed Ferris's account.

¶37. Goodman's jury instruction on compensatory damages failed to list attorney's fees as an element of damages to be awarded, and APAC submitted a jury instruction specifically instructing the jury that it could only consider damages to compensate for Goodman's injuries. APAC therefore moved for a new trial or a remittitur. At the hearing on the motion, APAC presented an affidavit which outlined the information it had obtained from the juror. Relying upon M.R.E. 606(b), the trial court refused to consider the affidavit and denied the motion. M.R.E. 609(b) prevents a juror from impeaching a verdict unless extraneous prejudicial information was improperly brought to the jury's attention, or an outside influence improperly influenced one or more members of the jury. Further, M.R.E. 609(b) prevents a juror's affidavit or any evidence of a statement made by a juror concerning the jury's deliberation from being received into evidence.

¶38. The use of a quotient verdict constitutes reversible error. ***Times Square Realty, Inc. v. City of Grenada,*** 421 So. 2d 1053, 1055 (Miss. 1982). "As to attorney's fees, the rule in the absence of statute is that they are not recoverable unless the facts are of such gross or willful wrong as to justify the infliction of punitive damages." ***State Farm Fire & Cas. Co. v. Simpson,*** 477 So. 2d 242, 253 (Miss. 1985).

¶39. However, unless "a threshold showing of external influences" is presented, a jury verdict should not be impeached. ***Gladney v. Clarksdale Beverage Co.,*** 625 So. 2d 407, 419 (Miss. 1993). Here, APAC has not made any allegation of external influences which may have tainted the jury verdict. Therefore, APAC

has failed to show that the trial court abused its discretion in denying its motion for new trial and/or remittitur.

## CONCLUSION

¶40. We affirm the denial of APAC's motion for summary judgment by the Circuit Court Warren County, Mississippi. We reverse the grant of partial summary judgment in favor of James Lee Goodman, the verdict and the judgment, and we remand for a new trial consistent with this opinion.

¶41. **AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR A NEW TRIAL.**

**PITTMAN, C.J., SMITH, P.J., COBB AND CARLSON, JJ., CONCUR. DIAZ, J., CONCURS IN RESULT ONLY. McRAE, P.J., EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION.**

1. It should be noted that it had rained the night before.

2. Goodman also named Dayton Hudson Corp. d/b/a Target Stores, Inc., as a defendant. The trial court granted summary judgment to Dayton Hudson, finding that, at the time of the accident, Dayton Hudson was not an occupier in control of the premises under Mississippi law, and therefore owed no duty to Goodman.

3. Exhibit 6 was first excluded, then admitted, and finally excluded as not showing the exact location of the fall.