CHANDLER, J.,
for the Court.
¶ 1. Diane B. Perkins, as mother and next friend of Danielle Dawn Perkins and Stacy Renee Perkins, sued Dr. Alton Dau-terive, alleging that Dr. Dauterive had committed medical malpractice that resulted in the wrongful death of her husband, Daniel Walter Perkins (Walter). The jury *775 returned a verdict for Dr. Dauterive. Perkins appeals, arguing that the trial court erroneously denied her motion for a new trial because (1) the verdict was against the overwhelming weight of the evidence, and (2) the jury received extraneous prejudicial information.
¶ 2. Finding no error, we affirm.
FACTS
¶ 3. The following facts were adduced at the trial, which occurred in May 2001 in the Circuit Court of Hancock County. On the morning of November 25, 1994, Walter went to a fishing camp in Lakeshore, Mississippi. At the camp, an assailant suddenly approached Walter and stabbed him once with a fishing knife in the area of the top right shoulder. The blade of the knife was just under five inches long. Paramedics arrived and treated Walter. Walter was bleeding from the stab wound and he was hypotensive, meaning that his blood pressure was abnormally low. Walter was transported to the emergency room at Hancock Medical Center and arrived at approximately 7:45 a.m.
¶4. Dr. Sean Appleyard, the on-duty emergency room physician, examined Walter and assessed his condition. Dr. Apple-yard administered an intravenous crystal-loid solution and other care, and Walter’s condition stabilized. Walter was communicative, and stated that he had been stabbed with “a twelve-inch knife” and that the knife had “bounced off [his] collarbone.” Walter reported that his right arm felt numb. His lungs were clear. Dr. Appleyard could not feel a pulse in Walter’s right arm, but he detected a slight pulse using doppler. Dr. Appleyard concluded that Walter had most likely sustained an injury to the right subclavian artery. Dr. Appleyard ordered x-rays of Walter’s chest. Upon reviewing the x-rays, Dr. Appleyard did not see any air or blood in Walter’s chest cavity. On review of the same x-rays a few; days later, a radiologist noted the presence of 'fluid in Walter’s chest cavity outside of the lungs.
¶ 5. At around 8:15 a.m., Dr. Appleyard called Dr. Dauterive, the on-call general and vascular surgeon, who was in the midst of performing elective surgery at Gulfport Memorial Hospital. Dr. Apple-yard informed Dr. Dauterive that Walter had a distal clavicular stab wound with a pulseless right arm and that he suspected a right subclavian artery injury. Dr. Dau-terive told Dr. Appleyard to order blood typing and to keep Walter stable, and advised that he would arrive at Hancock Medical as soon as he could. Dr. Apple-yard did not inquire what exact time Dr. Dauterive would be arriving, but, because Dr. Dauterive stated ■ his intent to come take responsibility for Walter, Dr. Apple-yard assumed that Dr. Dauterive would arrive within a reasonable time.
¶ 6. Walter’s family arrived at 8:45 a.m. and expressed concern about when Dr. Dauterive would come. Dr. Appleyard called Dr. Dauterive again at 9:15 a.m. and discussed the possibility of transferring Walter to another facility. Dr. Dauterive thought it likely that transfer would be moot because, by the time Walter made it to a different hospital, Dr. Dauterive already would have arrived at Hancock Medical. . As transfer would take between one and one half hour, the doctors decided that it would be best to keep Walter at Hancock Medical and await Dr. Dauterive. Dr. Dauterive said he would be there as soon as possible. Dr. Appleyard advised the family that it would be risky to transfer Walter due to the fragility of his condition and the time it would take to transfer him. The family agreed to leave Walter at Hancock Medical.
¶ 7. Dr. Dauterive arrived between 10:30 and 11:00 a.m. He examined Walter and *776 determined based upon Walter’s clinical presentation that Walter’s arterial injury was most likely underneath the stab wound where the knife had entered the skin, which meant that Walter had an injury to the proximal axillary artery or to the distal right subclavian artery, necessitating surgical repair. “Proximal” indicates a location on the body closer to the heart. “Distal” indicates a location on the body farther away from the heart. On the right side of the body, the innominate or bra-chiocephalic artery comes from the aorta, and branches into the carotid and subclavi-an arteries. The carotid artery travels up the neck, while the subclavian artery winds over the first rib, underneath the clavicle, and down the shoulder and becomes the axillary artery.
f 8. At 12:05 p.m., Dr. Dauterive began surgery. The goal of the surgery was to locate the injured portion of the artery and to gain control of the artery on either end of the injury, first proximally and then distally, and then to repair the injured portion. Dr. Dauterive made an infraclavi-cular incision approximately ten centimeters proximal to the surface wound. He exposed the right subclavian artery and began exploring the artery, moving distally. Walter’s blood pressure became elevated at 12:85 p.m. At 12:50 p.m., Walter became hypotensive. Dr. Dauterive performed an emergency median sternotomy to open the chest and called for assistance from his partner, Dr. Leonovicz. When Dr. Dauterive opened Walter’s chest, he discovered that Walter had bled massively (exsanguinated) into his chest cavity, which had caused the drop in his blood pressure. Dr. Dauterive discovered that the arterial injury was located more proximally than he initially suspected; in fact, the proximal end of the subclavian artery was nearly transected directly underneath the head of the clavicle. The reason Walter had presented to the hospital in such good condition was that a blood clot had temporarily sealed the injured artery. During the surgery, the clot had become dislodged, resulting in sudden exsanguination.
¶ 9. Dr. Dauterive clamped the artery to control the bleeding. The surgical team transfused Walter with packed red blood cells and installed an arterial line for more exact monitoring of blood pressure. An emergency line for rapidly transfusing blood products was placed in Walter’s saphenous vein. Dr. Dauterive repaired the artery using a saphenous vein graft obtained from Walter’s groin. Walter began oozing blood from all exposed surfaces. At 1:45 p.m., Walter received his first transfusion of fresh frozen plasma, and at 3:00 p.m. he was transfused with platelets obtained from another hospital. However, Walter developed coagulopathy as a result of his exsanguination and blood replacement. Coagulopathy is a failure of the clotting factors in the blood, resulting in excessive bleeding, and is difficult to reverse. Walter’s coagulopathy could not be reversed during the surgery. Dr. Dau-terive released Walter to intensive care for further transfusion of blood products in an effort to stop the coagulopathy. The coag-ulopathy continued, and family members decided to take Walter off life support. He was pronounced dead at 10:18 p.m.
¶ 10. Diane Perkins and her children commenced a wrongful death action against Drs. Dauterive and Appleyard, Hancock Medical Center, and Van Meter and Associates, an entity with which Dr. Appleyard was under contract. Hancock Medical Center was dismissed from the case prior to trial, and Perkins settled with Dr. Appleyard and Van Meter and Associates during the trial, leaving Dr. Dauterive as the sole defendant. After the trial, the jury voted 9-3 in favor of Dr. Dauterive.
*777 LAW AND ANALYSIS
I. DID THE TRIAL COURT ERRONEOUSLY DENY PERKINS’ MOTION FOR A NEW TRIAL BECAUSE THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 11. After the jury verdict for Dr. Dauterive, Perkins filed a motion for a new trial, arguing, inter alia, that the verdict was against the overwhelming weight of the evidence. The trial court denied the motion. On appeal, Perkins contends that the evidence of several breaches of the standard of care by Dr. Dauterive was so overwhelming that the verdict was contrary to the weight of the evidence.[1] We disagree and affirm the trial court’s denial of the motion for a new trial.
¶ 12. The grant or denial of a motion for a new trial is a matter entrusted to the lower court’s sound discretion, and this Court will only reverse the denial of a new trial when we are convinced that the lower court abused its discretion. Green v. Grant, 641 So.2d 1203, 1207 (Miss.1994). “Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal.” Herrington v. Spell, 692 So.2d 93, 103 (Miss.1997). In determining whether the verdict was against the overwhelming weight of the evidence, we review all of the evidence as a whole, in the light most favorable to the verdict, and generally accept as true all of the credible evidence in favor of the non-moving party. Brandon HMA, Inc. v. Bradshaw, 809 So .2d 611, 616 (¶ 13) (Miss.2001); Green, 641 So.2d at 1203. We will reverse only if “no reasonable, hypothetical juror could have found as the jury found.” Brandon HMA Inc., 809 So.2d at 616 (¶ 13).
¶13. As the plaintiff, Perkins had the burden to prove the elements of medical malpractice by a preponderance of the evidence. Phillips v. Hull, 516 So.2d 488, 491 (Miss.1987). To present a prima facie case of medical malpractice, a plaintiff “(1) after establishing the doctor-patient relationship and its attendant duty, is generally required to present expert testimony (2) identifying and articulating the requisite standard of care and (3) establishing that the defendant physician failed to conform to the standard of care. In addition, (4) the plaintiff must prove the physician’s noncompliance with the standard of care caused the plaintiffs injury, as well as proving (5) the extent of the plaintiffs damages.” McCaffrey v. Puckett, 784 So.2d 197, 206 (¶33) (Miss.2001). Once a prima facie case is made, the defendant physician is not required to put on expert testimony rebutting the prima facie case in order to survive a directed verdict. Id. Rather, a prima facie case of medical malpractice creates a fact question for the jury to resolve. See id. at 206-07 (¶ 35). Perkins argues that the evidence was such that the jury reasonably could have concluded only that Walter died because Dr. Dauterive breached the standard of care, in other words, that Dr. Dauterive failed to provide Walter with that degree of skill and diligence which would have been provided by a reasonably prudent, minimally competent general and vascular surgeon in the same or similar circumstances. See McCarty v. Mladineo, 636 So.2d 377, 381 (Miss.1994).
*778 ¶ 14. All the surgical experts agreed that the proper surgical goal in this case was to obtain proximal and distal control of Walter’s arterial injury and then to repair the injury. The main dispute was over the correct preoperative approach, specifically, whether the standard of care required Dr. Dauterive to order an arterio-gram. An arteriogram is a diagnostic procedure in which contrast dye is injected into an artery to reveal blood flow in the artery. Perkins’s expert, Dr. Stephen Smith, testified that an arteriogram would have shown the portion of the artery with good blood flow and enabled Dr. Dauterive to quickly establish proximal control during the surgery. Dr. Smith stated that, had Dr. Dauterive ordered an arteriogram, he would have known the exact location of Walter’s arterial injury, would have made a different first incision, and would have accessed and controlled the transected artery before the blood clot became dislodged.
¶ 15. The experts generally agreed that the correct preoperative approach was dictated by the location of the entrance wound. If the entrance wound was located within one of the three surgical zones of the neck, then the standard of care required Dr. Dauterive to order a preoperative arteriogram in order to determine the correct first incision. But if the entrance wound was not in a surgical zone, then an arteriogram could be ordered at the surgeon’s discretion. The surgical experts and Dr. Dauterive agreed the injury that was ultimately discovered to Walter’s proximal subclavian artery was in surgical zone 1, but there was also agreement that the zone classifications are used for entrance wounds, not what is consequently discovered during surgery. There was conflicting testimony about the boundaries of the surgical zones of the neck and about where the entrance wound was located on Walter’s body. Dr. Smith opined that an arteriogram was required because Walter’s entrance wound was in the lowermost surgical zone of the neck, known as zone 1.
¶ 16. Dr, Dauterive testified that his assessment and treatment of Walter had been informed by his clinical judgment and experience. Dr. Dauterive stated that, though an arteriogram would have been necessary had the entrance wound been in zone 1, Walter’s entrance wound was over the distal one third of the clavicle and was outside of zone 1. Dr. Dauterive said that Walter’s pulseless right arm was a hard sign of vascular injury and, in his judgment, he needed to go straight to surgery without an arteriogram. He said that an arteriogram would have taken between one and two hours. Dr. Dauterive stated that it was his clinical judgment that conducting an arteriogram would have been too dangerous given Walter’s arterial injury.
¶ 17. Dr. Smith testified that Walter’s entrance wound was in zone 1 because zone 1 extends vertically from the cricoid cartilage down to the clavicles and horizontally to the distal ends of the clavicles. There was other medical evidence that zone 1 is not commonly thought to extend all the way to the clavicles and Dr. Smith admitted that most medical texts do not definitively depict or discuss any lateral boundaries of the zones of the neck. Dr. Smith stated that accepted surgical protocol required a hemodynamically stable patient like Walter with an injury in zone 1 and hard signs of vascular injury to receive an arteriogram prior to surgery. He stated that there was only a one to two percent chance of a complication from an arteriogram in Walter’s case, and only a small risk that Walter’s blood pressure would rise during the procedure and cause the blood clot to dislodge. Dr. Smith stated that Dr. Dauterive’s treatment of Walter breached the standard of care and caused or contributed to Walter’s death.
*779 ¶ 18. Dr. Dauterive’s expert, Dr. Kennan Buechter, stated that Dr. Dauterive did not breach the standard of care in. treating Walter and that his treatment did not cause or contribute to Walter’s death. He stated that Walter’s clinical picture revealed no sign of the proximal subclavian artery injury that was ultimately discovered, and that it was reasonable for Dr. Dauterive to conclude that Walter had suffered a proximal axillary artery or distal subclavian artery injury. He stated that, though an x-ray was later determined to. have depicted fluid outside the lung field, that finding did not rule out the injury suspected by Dr. Dauterive. Dr. Buechter stated that Dr. Dauterive’s first incision was a reasonable approach. He said that the entrance wound was on the distal shoulder, outside of zone 1, and, therefore, no arteriogram was required. Dr. Buechter stated that, had Walter been his own patient, he would not have ordered an arteriogram.
¶ 19. Perkins offered the autopsy report as evidence of the location of the entrance wound. The report contained a drawing of a body with marks indicating the injuries and incisions found on Walter’s body. The drawing tended to show that the entrance wound of the knife was located on or very near Walter’s neck, supporting the argument that the entrance wound was in zone 1. During his testimony for Dr. Dauterive, Dr. Buechter pointed out that the position of the entrance wound on the drawing conflicted with the portion of the autopsy report dictated by the pathologist, which described the injury as being on the “right shouldertop,” and supported Dr. Buechter’s opinion that the entrance wound was not in zone 1.
¶ 20. Perkins attacked several other aspects of Dr. Dauterive’s performance, and Dr. Dauterive offered évidence challenging these contentions. Dr. Smith posited that Walter’s outcome would have been different had he been given plasma and platelets, which are clotting factors, earlier in the surgery. Dr. Dauterive testified that he did not need to administer clotting factors any earlier because clotting would have interfered with his repair of the transected artery.
¶21. Dr. Smith testified that the hours Walter spent in the' emergency room before Dr. Dauterive arrived caused or contributed to his death because he did not receive definitive care quickly enough. Dr. Smith opined that Walter should have been transferred. There was evidence that Dr. Dauterive did not breach the standard of care regarding his arrival time and fact that Walter was not transferred. Dr. Appleyard testified that Hancock Medical was a level four trauma center, which meant that it did not have trauma surgeons immediately available. Perkins’s emergency medicine expert, Dr. Guzzardi, testified that any delay in Walter’s care was attributable to Dr; Appleyard, who, as the emergency room physician, had a duty to coordinate timely care for Walter.
¶ 22. Clearly, Perkins and Dr. Dauterive put on conflicting credible evidence regarding the standards of care applicable to Walter’s treatment and whether or not Dr. Dauterive’s performance comported with the standards of care. It is the province of the jury to evaluate the credibility of the witnesses and to resolve evi-dentiary conflicts by accepting or rejecting evidence. Brandon HMA, 809 So.2d at 617 (¶20). This Court declines Perkins’s invitation to examine the knife with which Walter was stabbed and attempt to determine whether Dr. Dauterive’s defense theory is physically plausible; that issue requires complex analysis of the medical evidence and is a classic example of a question rightfully entrusted to the jury. We find that the evidence present *780 ed in this case was such that a reasonable juror could conclude that Perkins failed to prove Dr. Dauterive committed malpractice in his treatment of Walter. The verdict was not against the overwhelming weight of the evidence, and the trial court did not abuse its discretion in denying Perkins a new trial.
II. DID THE TRIAL COURT ERRONEOUSLY DENY PERKINS’ MOTION FOR A NEW TRIAL BECAUSE THE JURY RECEIVED EXTRANEOUS, PREJUDICIAL INFORMATION?
¶ 23. Perkins also moved for a new trial on the ground of jury misconduct. Perkins alleged that, in a post-verdict interview, a juror in the minority alleged that a majority juror made a prejudicial statement to the jurors during deliberations. Perkins submitted an affidavit of the minority juror, Joe Bourgeois, stating:
A lady who said she was a nurse also served on the jury and sat on the back row in the jury box. During the last approximately twenty minutes of the jury deliberations, the nurse said that she was familiar with what doctors go through and she stated as a fact to the other jury members that if we returned a verdict for the Plaintiffs that the doctor would lose his medical license or have his license suspended. She emphasized for that reason the jury should vote for the Defendant. The 9-3 vote for the Defendant was taken shortly after the nurse made this statement to the jury.
¶24. Perkins contended that certain questions posited by the jury to the trial court during deliberations supported the conclusion that the nurse’s statement was the impetus for the defense verdict. The case was submitted to the jury at 12:50 p.m. At 2:00 p.m., the jury sent a note asking whether they could consider Dr. Appleyard’s potential responsibility; at 2:45 p.m., the jury asked how much insurance money Perkins received, the amount of the Perkins’s attorneys’ fees, and whether Perkins could recover damages if they ruled for Dr. Dauterive. The court responded to these notes by instructing the jury that it should consider Dr. Apple-yard’s fault as set out in a jury instruction, that the court could not answer the questions about insurance money and attorneys’ fees, and that the jury had all the evidence and instructions of law. At approximately 3:40, the jury returned the verdict for Dr. Dauterive. Perkins argued that the jury’s questions to the court, along with the affidavit, indicated that the jurors were indecisive about ruling against Perkins until the nurse’s statement swayed them in favor of Dr. Dauterive. The trial court denied Perkins’s motion, and Perkins argues that the ruling was error.
¶ 25. Mississippi Rule of Evidence 606(b) states:
Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon his or any other juror’s mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
*781 (emphasis added). The rule against a juror revealing influences on his-own verdict precludes a juror from testifying as to extraneous information or outside influence which he, himself, introduced to the jury. Gladney v. Clarksdale Beverage Co., 625 So.2d 407, 413 (Miss.1993). A juror may only testify as to extraneous information or outside influence introduced by other jurors or other sources, and may not testify as to how that information or influence affected the verdict. Id. at 414, 419.
¶ 26. Gladney prescribes the process for jury inquiry by the trial court. Gladney, 625 So.2d at 418-19. The inquiry begins when the trial court and opposing counsel are made aware of potential juror misconduct by the manifestation of evidence of juror misconduct. Id. at 418. Regarding the scope of counsel’s right to attack an unfavorable verdict by investigating juror misconduct, “a balance must be struck between the right to inquire into the jury verdict and the right of each juror to be free from harassment and secure in their verdict.” Id. Jury inquiry is not permitted as a “mere fishing expedition” for a way to challenge an undesirable verdict. Id.
¶ 27. When evidence of misconduct is manifested, the trial court must consider whether an investigation is warranted. Id. An investigation is warranted if there is “sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information .... Although a minimal standard of a good cause showing of specific instances of misconduct is acceptable, the preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred.” Id. at 419. The showing must be adequate to overcome the presumption in Mississippi of jury impartiality. Id.
¶ 28. If an investigation is warranted, the trial court should hold an investigative post-trial hearing. Id. In accordance with precedent and Rule 606(b), the trial,court may not permit any inquiry into the internal deliberations of the jurors or the subjective effects'of the extraneous information. Id. “Once it is determined that the communication was made and what the contents were, the court is then to decide whether it is reasonably possible this communication altered the verdict.” Id. In assessing the significance of the extraneous information, the court may order a new trial if the extra-record facts are material, that is, they affect an issue of importance in the case, and if- the extra-record facts are qualitatively different from the evidence properly presented to the jury in the case. Id. at 414 (quoting Salter v. Watkins, 513 So.2d 569, 571 (Miss.1987)). An example of an application of this framework resulting in a new trial is the case of James v. State, 777 So.2d 682, 700 (¶ 60) (Miss.Ct.App.2000), in which a juror revealed to others the defendant’s alleged prior commission of the same crime.
¶ 29.' In the instant case, the court considered the impact of Juror Bourgeois’s affidavit. The court found that the information in the affidavit did not. go to the material issue of the case, which was whether Dr. Dauterive breached the standard of care in his treatment of Walter.” The court held that Bourgeois’s affidavit was insufficient to show that the jurors were exposed to extraneous information that reasonably altered the verdict and that, pursuant to the procedure articulated in Gladney, it was not necessary for the, court to further inquire into whether the alleged extraneous information was considered by the jurors during deliberations. We review the trial court’s denial of an investigative hearing in this context for *782 abuse of discretion. Brake v. Speed, 605 So.2d 28, 87 (Miss.1992).
¶ 30. Both parties have thoroughly-briefed this issue. Perkins argues that the facts demonstrated a reasonable possibility that the information alleged in Bourgeois’s affidavit altered the verdict. Perkins argues that the majority juror’s statement that a verdict for Perkins would cause Dr. Dauterive to be suspended or to lose his medical license was significantly prejudicial because of that juror’s status as a nurse. Perkins contends that the jury’s questions to the trial court support the conclusion that they were concerned with extraneous matters rather than the evidence. Perkins points out that prejudice may be inferred from the timing of the verdict in that the jury returned its verdict for Dr. Dauterive approximately 20 minutes after the nurse’s statement. Dr. Dau-terive argues, inter alia, that the nurse’s statement was not an outside influence upon the jury and that Juror Bourgeois was a relative of Diane Perkins and executed the affidavit in an effort to help Perkins challenge the defense verdict.[2]
¶ 31. In Brake, the court addressed the concept of extraneous information and pronounced, “it does not matter that information outside the record is provided by a fellow juror as opposed to some other person .... [i]f the [extraneous] information is outside the record of proceedings in open court, it is an outside influence under the rule.” Brake, 605 So.2d at 38. More recently, our supreme court rejected a losing party’s claim that the jury relied upon impermissible extraneous information in reaching its verdict. APAC-Miss. Inc. v. Goodman, 803 So.2d 1177, 1186 (¶39) (Miss.2002). In APAC-Mississippi, jurors stated that the jury had used a calculation method known as a “quotient verdict” in determining a damage award. Id. at 1185-86 (¶ 36). Observing that quotient verdicts are not permitted in Mississippi, the court nonetheless held that the jurors’ use of the quotient verdict method was not reliance upon external influences that would warrant an new trial. Id. at 1186 (¶¶ 38-39).
¶ 32. The case of Payton v. State, 2001-KA-01658-SCT (¶¶ 123-135), — So.2d -, 2003 WL 22510533 (Miss. Nov. 6, 2003), contains facts similar to the case at bar. At voir dire, the trial court had ascertained that, because the county was rural, the jurors knew some of the persons involved with the case but those jurors promised to be impartial. Id. at (¶ 130). Payton moved for a new trial and sought to introduce the affidavit of a juror stating that several jurors personally knew one witness and told the other jurors that the witness would not lie respecting his testimony. Id. at (¶ 125). The court held the affidavit faded to meet the threshold showing of external influences because all of the proposed evidence therein related to things which some jurors told other jurors during the deliberative process, and there was no evidence that someone outside the twelve jurors did something to influence their deliberations. Id. at (¶¶ 134-35).
¶ 33. As in Payton, the statement regarding the verdict’s potential impact on Dr. Dauterive’s licensing was based on the personal knowledge of one of the twelve jurors and did not come from someone outside the jury room. APAC-Mississip-pi and Payton indicate that jurors are permitted to bring some degree of personal knowledge and experience into the deliberation process without jeopardizing their verdict. Even were we to find that the nurse’s alleged statement pushed the *783 permissible boundary, considering all the facts of this case, the trial court acted well within its discretion in determining that there was no reasonable possibility that the nurse’s information swayed the other eight majority jurors to ignore the copious evidence legitimately presented in this case and to vote for Dr. Dauterive. We observe that “public policy requires a finality to litigation.” Martin v. State, 732 So.2d 847, 852 (¶ 22) (Miss.1998). This issue is without merit.
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF HANCOCK COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, GRIFFIS AND BARNES, JJ„ CONCUR.

. Perkins's motion for a new trial alternatively requested a JNOV, and challenged both the weight and the sufficiency of the evidence. As Perkins’ brief only addresses the weight of the evidence and not the sufficiency of the evidence, we limit our appellate review to the weight of the evidence.

. We note that the record contained insufficient evidence from which this Court could conclude that Perkins and Juror Bourgeois were related.