# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00797-COA

**LINDIN ELLZEY A/K/A LINDIN JOE ELLZEY**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                                                          APPELLEE

DATE OF JUDGMENT:                06/10/2022
TRIAL JUDGE:                          HON. DAL WILLIAMSON
COURT FROM WHICH APPEALED:    JONES COUNTY CIRCUIT COURT,
                                      SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:        GRAHAM PATRICK CARNER
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                      BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:                ANTHONY J. BUCKLEY
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                        AFFIRMED - 11/19/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Following a jury trial, Lindin Ellzey was convicted of three counts of fondling his stepdaughter.  On appeal, Ellzey argues (1) that his indictment was defective because it alleged an overly broad range of dates for each of the counts.  He also argues the trial court erred by (2) not investigating alleged juror misconduct, (3) limiting his cross-examination and impeachment of a witness, (4) admitting the victim's counseling records, (5) allowing a forensic interviewer to vouch for the victim's credibility, (6) admitting a law enforcement officer's "speculative testimony," (7) admitting hearsay, (8) admitting the victim's father's "speculative testimony," and (9) allowing the victim's father to vouch for the victim's

credibility. In addition, Ellzey argues that (10) the State made an improper closing argument, (11) his trial counsel provided ineffective assistance, and (12) cumulative errors denied him a fair trial. For the reasons discussed below, we find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Evidence at trial showed that from the time Mary[1] was eight years old until she was around twelve years old, her stepfather, Ellzey, molested her on numerous occasions. During this time, Mary and Ellzey lived with Mary's mother, Jane, and Mary's younger half-sister, Meredith. According to Mary, when her mother would leave home, Ellzey would order Mary to take off her clothes or, if she refused, "pin [her] down" and forcibly remove her clothes. Mary testified that after Ellzey would then

> rub on, lick, suck [her] vagina, [and] make [her] do the same thing to him. He would do the same thing to [her] breasts. . . . [I]f [she] was taking a shower, he would sometimes just come and look over the shower while [she] was in there. And he would make [her] get in the shower with him sometimes. He would put a black vibrator on [her] vagina. And he had a toy that was shaped like a vagina. It was black and pink that he kept in his closet, and he would make [her] put that on him. Sometimes [she] would wake up and he would just be in the bed with [her]. He would make [her] watch porn with him as he was doing these things to [her] and as . . . he made [her] do them to him. And he would beg [her] not to tell anybody.

Mary testified that if Meredith was also home, Ellzey would "lock [Meredith] in another room" while he molested Mary. According to Mary, Ellzey sexually abused her too many times for her to count—"every month, every time [her] mom wasn't at home."

¶3.     For years, Mary told no one about the abuse. She testified that she did not tell anyone

---

[1] In the interest of the victim's privacy, we use pseudonyms for the victim, her parents, and her half-sister.

because Ellzey "manipulated [her] into thinking that [she] was the one doing wrong." She also testified that Ellzey threatened that "he would kill himself" if she told anyone about the abuse. According to Mary, Ellzey also gave her money and gifts to keep her quiet.

¶4. The abuse ended in 2013 when Ellzey and Jane separated and later divorced. After the separation, Ellzey exercised visitation with Meredith every Thursday night. Mary became concerned for Meredith's safety and testified that she "battled with that inside of [her] knowing that [Meredith] was" with Ellzey. Mary testified that after several months, she "finally . . . built up enough courage" to tell Jane that Meredith "wasn't safe" with Ellzey, but she still did not disclose Ellzey's abuse or explain why Meredith was not safe.

¶5. Concerned, Jane and Mary's father, Henry, scheduled an appointment at Forrest General Hospital for someone to try to talk to Mary. But Mary would not talk to anyone during her appointment. Despite Mary's silence, Jane told a nurse that she thought Mary may have been sexually abused. The nurse contacted the Mississippi Department of Human Services (DHS), and DHS initiated an investigation. Diara Thompson, a family protection specialist with the Mississippi Department of Child Protection Services (CPS),[2] testified that in February 2014, DHS received an initial report of an allegation of sexual abuse. According to Thompson, she interviewed Mary and Meredith at their schools and Jane at her home. Thompson also spoke with Ellzey by phone after he called her. Thompson testified Mary simply said that "she did not like the way [Ellzey] looked at her" and that she felt safe at

_____

[2] CPS is currently Mississippi's lead child welfare agency and is responsible for investigating allegations of abuse and neglect. In 2014, the Division of Family and Children's Services, a division of DHS, was responsible for such investigations.

home only "sometimes." According to Thompson, she asked Mary whether Ellzey "had ever done anything else that she did not like," and Mary said, "No." Thompson testified that Mary never said Ellzey had ever abused her in any way. Thompson concluded there was no evidence of abuse, and DHS closed its investigation on March 18, 2014. The allegation of abuse was deemed "unsubstantiated."

¶6. For the next two-and-a-half years, Mary did not tell anyone about Ellzey's abuse. Mary testified that she thought Meredith was safe because Ellzey's visitation was supervised. However, in October 2016, Ellzey filed a petition to modify custody and visitation in which he sought custody of Meredith. At that point, Mary became "hysterical." Henry testified that about a month later, on their way home from a hunting trip, Mary told him, "I want to talk to somebody about what [Ellzey did] to me." Mary still did not want to tell Jane or Henry about the abuse, so Jane sought advice from her attorney, Brad Thompson, and then took Mary to see him. After talking to Mary in private, the attorney advised Jane and Henry to take Mary to the sheriff's department to make a report of sexual abuse.

¶7. Brad Thompson informed Tonya Madison, an investigator with the Jones County Sheriff's Department, that Mary had made allegations of sexual abuse, and Madison told him to send Mary and Jane to her office. Mary and Jane gave statements to Madison's secretary. Madison reviewed their statements and then scheduled a forensic interview for Mary. Daniel Dooley, the lead forensic interviewer at the South Mississippi Child Advocacy Center in Gulfport, interviewed Mary in December 2016. A video of the interview was admitted into evidence at trial and played for the jury without objection.

4

¶8.     Charles Myers, an investigator with the Jones County Sheriff's Department, arrested and interviewed Ellzey in January 2017. A video of the interview was admitted into evidence and played at trial. During the interview, Ellzey denied having molested Mary.

¶9.     In June 2017, a Jones County grand jury indicted Ellzey for three counts of fondling. Miss. Code Ann. § 97-5-23(2) (Rev. 2014). In April 2018, Ellzey's first trial ended in a mistrial due to a hung jury. Ellzey was retried in June 2022, and the jury found him guilty of all three counts. The court imposed a sentence of fifteen years in the custody of the Department of Corrections on Count I; a consecutive, suspended five-year sentence with five years of post-release supervision (PRS) on Count II; and a concurrent, suspended five-year sentence with five years of PRS on Count III. Ellzey filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

**ANALYSIS**

¶10.    On appeal, Ellzey raises the twelve issues listed in the introduction to this opinion. We address those issues in turn.

### I.      Sufficiency of the Indictment

¶11.    Prior to trial, Ellzey moved to quash his indictment, arguing that it failed to allege the dates of the offenses with sufficient specificity. The trial court denied the motion. Ellzey now argues that the trial court erred by denying the motion.[3] Specifically, Ellzey argues that the indictment's allegations that he committed each offense sometime between January 2009

---

[3] Whether an indictment is defective is a question of law that we review de novo. *Jones v. State*, 912 So. 2d 973, 975 (¶8) (Miss. 2005).

and January 2014[4] fail to comport with Mississippi Rule of Criminal Procedure 14.1(a)(2)(E), which requires that an indictment list "the date and, if applicable, the time at which the offense was alleged to have been committed." MRCrP 14.1(a)(2)(E).

¶12.    However, Ellzey's reliance on the Rules of Criminal Procedure is misplaced because he was indicted in June 2017—before the Rules of Criminal Procedure took effect on July 1, 2017. Therefore, the Rules of Criminal Procedure did not apply to Ellzey's indictment. *See Brown v. State*, 285 So. 3d 671, 677 (¶22) (Miss. Ct. App. 2019).

¶13.    In June 2017, the Uniform Rules of Circuit and County Court Practice (URCCC) and the Mississippi Code laid out the requirements of an indictment. Uniform Rule 7.06(5) provided, "An indictment shall . . . include . . . [t]he date and, if applicable, the time at which the offense was alleged to have been committed. *Failure to state the correct date shall not render the indictment insufficient.*" URCCC 7.06(5) (repealed July 1, 2017) (emphasis added). Similarly, Mississippi Code Annotated section 99-7-5 provided,

> An indictment for any offense shall not be insufficient for omitting to state the time at which the offense was committed in any case where time is not of the essence of the offense, nor for stating the time imperfectly, nor for stating the offense to have been committed on a day subsequent to the finding of the indictment, or on an impossible day, or on a day that never happened . . . .

---

[4] The indictment alleged that Ellzey "ma[d]e [Mary] . . . lick his penis" (Count I); "handle[d], touch[ed], and lick[ed] [Mary's] vaginal area" "with his hands and mouth" (Count II); and "handl[ed], touch[ed], and lick[ed] [Mary's] breast area" "with his hands and mouth" (Count III). The indictment alleged that Ellzey committed each offense "between January[] 2009 . . . and January[] 2014" "at a time when [Ellzey] occupied a position of trust and authority over [Mary], being her step-father" and "for the purpose of satisfying his depraved, licentious, sexual desires."

Miss. Code Ann. § 99-7-5 (Rev. 2015).[5]

¶14. In addition, our Supreme Court and this Court have rejected the argument that broad time frames in child sexual abuse cases will render an indictment insufficient, at least "so long as the defendant is fully and fairly informed of the charges against him." *Tapper v. State*, 47 So. 3d 95, 101 (¶22) (Miss. 2010); *Bradshaw v. State*, 371 So. 3d 822, 831 (¶23) (Miss. Ct. App. 2023). The indictment's "purpose is to inform the defendant with some measure of certainty as to the nature of the charges brought against him so that he may have a reasonable opportunity to prepare an effective defense and to enable him to effectively assert his constitutional right against double jeopardy in the event of a future prosecution for the same offense." *Moses v. State*, 795 So. 2d 569, 571 (¶13) (Miss. Ct. App. 2001).[6] Under Rule 7.06, section 99-7-5, and our precedent, an incorrect date or a broad range of dates does not render an indictment insufficient unless the date is "of the essence of the offense" or the date range fails to "fully and fairly inform[]" the defendant "of the charges against him." Miss. Code Ann. § 99-7-5; *Tapper*, 47 So. 3d at 101 (¶22).

¶15. Here, the date is not "of the essence of the offense" because it is undisputed that Mary was under the age of sixteen and that Ellzey occupied a position of trust over her at all relevant times. In addition, the indictment fully and fairly informed Ellzey of the charges against him—that between January 2009 and January 2014, while he was Mary's stepfather,

---

[5] The language of section 99-7-5 remains unchanged and in effect.

[6] An indictment that is defective because it fails to fulfill its basic purpose cannot be "cured by proof received during the trial." *Id.* at 572 (¶16) (citing *Copeland v. State*, 423 So. 2d 1333, 1336 (Miss. 1982)).

he forced her to lick his penis, and he touched and licked her vaginal area and breasts, all "for the purpose of satisfying his depraved, licentious, sexual desires." Ellzey's only defense was that he was totally innocent and that the allegations against him were fabricated in response to his attempt to obtain custody of Meredith. Ellzey fails to show how that defense was prejudiced by the indictment's allegations regarding the dates of the offenses.

¶16. Citing *Moses*, *supra*, and *Morris v. State*, 595 So. 2d 840 (Miss. 1991), among other cases, Ellzey also argues that the State failed to use its "best investigative efforts" to "narrow" the time frames alleged in his indictment. In *Moses*, this Court held that the indictment was defective because it was "patently clear that the State, in drafting the [*twenty-two*] repetitively identical and essentially uninformative counts of [the] indictment, made no effort to narrow the dates of the separate offenses in any meaningful way." *Moses*, 795 So. 2d at 572 (¶16). Further, in *Moses*, there was "no question but that the State was aware of information that would have easily permitted it to provide substantially shortened ranges of dates for each offense, together with other relevant facts that would have more specifically identified the alleged incident upon which that count was based." *Id.*

¶17. Here, in contrast, Ellzey fails to show how the State could have reasonably narrowed the alleged date range. Mary testified that the abuse happened so often and for so long that she could not remember specific dates. She testified that she could remember that the abuse began in the third grade—around the time she was eight years old—and continued until Jane and Ellzey separated in 2013. So, the State alleged that Ellzey committed three distinct acts that constituted molestation of Mary between January 2009 and January 2014. That time

frame, while broad, was reasonable and narrow enough under the circumstances to fully and fairly inform Ellzey of the charges against him. *See Mendez v. State*, 309 So. 3d 1109, 1117-18 (¶¶40-42) (Miss. Ct. App. 2020) (holding that a two-year date range was sufficient where the minor victim "lived in the same trailer as" the defendant and "testified that the abuse occurred on a daily basis" throughout the period); *Shoemaker v. State*, 256 So. 3d 604, 610-12 (¶¶21-29) (Miss. Ct. App. 2018) (holding that a two-year date range was sufficient where the minor victim "testified that the sexual misconduct occurred so often she could not give specific dates and times," and she and the defendant "had constant interaction with each other during the period"). Accordingly, Ellzey's indictment was sufficient, and the trial court did not err by denying his motion to quash the indictment.

## II. Alleged Juror Misconduct

¶18. Following his second trial, Ellzey filed a motion for a new trial based on alleged juror misconduct. Ellzey's motion alleged that Stephanie Beverly, "a potential juror on the panel who was not chosen" stated that juror Billy Walters had told her (1) that "the entire jury wondered why [Ellzey] did not testify" and (2) that "a female juror told the jury during deliberations that her husband works at either Forrest General Hospital or South Central Regional Medical Center and . . . shared her husband's belief that 'DHS always drops the ball.'" (Emphasis omitted). At a hearing on the motion, the trial court did not allow Beverly to testify but accepted a proffer from Ellzey that her testimony would have been consistent with the allegations in his motion. At the hearing, the State represented that "surveillance footage from the courtroom . . . that spans the entire trial . . . shows that Ms. Beverly . . .

9

inserted herself into this matter for reasons unknown." According to the State, Beverly could be seen "on multiple occasions having private conversations with defense counsel," including one thirty-minute conversation. In addition, according to the State, Beverly could be seen "sitting [and speaking] with [Ellzey's] family" throughout the trial and even appeared to "physically comfort[]" Ellzey's family when the verdict was read. Thus, the State's position was that Beverly's allegations were "not credible, clearly biased, and should not be considered as evidence of any alleged impropriety on the part of the jury." The surveillance video was admitted into evidence at the hearing. At the conclusion of the hearing, the trial court denied Ellzey's motion for a new trial without conducting a further investigation. On appeal, Ellzey argues that the trial court's ruling was an abuse of discretion.[7]

¶19. "Once an allegation of juror misconduct arises, then the next step is to consider whether an investigation is warranted. In order for the duty to investigate to arise, the party contending there is misconduct must make an adequate showing to overcome the presumption in this state of jury impartiality." *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407, 418 (Miss. 1993). The party alleging misconduct "must," "[a]t the very minimum," "show[] that there is *sufficient evidence* to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information." *Id.* at 419 (emphasis added). "[T]he preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred." *Id.* "In the absence of a threshold

---

[7] "We review the trial court's decisions concerning jury influence for an abuse of discretion." *Grimes v. State*, 361 So. 3d 179, 189 (¶24) (Miss. Ct. App. 2023) (citing *Murry v. State*, 218 So. 3d 303, 307 (¶17) (Miss. Ct. App. 2017)).

showing of external influences, an inquiry into the juror verdict is not required." *Id.*

¶20.     If the trial court conducts an investigation and recalls jurors to testify regarding an allegation of external influences, Mississippi Rule of Evidence 606(b) generally prohibits jurors from testifying "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." MRE 606(b)(1).  There are only two exceptions to this general rule: "[a] juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; or (B) an outside influence was improperly brought to bear on any juror." MRE 606(b)(2).  Even then, jurors are limited to testifying only about the external influence itself—"whether the communication was made and what it contained." *Gladney*, 625 So. 2d at 419.  Jurors are not allowed to testify about the jury's "deliberative process or [the] subjective effects of the extraneous information." *Id.* (quoting *Hard v. Burlington N. R.R.*, 812 F.2d 482, 485 (9th Cir. 1987), *abrogated on other grounds by Warger v. Shauers*, 574 U.S. 40 (2014)); *see* MRE 606 advisory committee note ("When jurors are permitted to testify about objective facts not of record and about outside influences, they may not be questioned about the effect upon them of what was improperly brought to their attention.").

¶21.     We begin by addressing Ellzey's allegation that a non-juror (Beverly) said that a juror (Walters) said that "the entire jury wondered why [Ellzey] did not testify."  The trial court did not abuse its discretion by declining to conduct a further investigation into this allegation. Even if we assume that Walters would have offered such testimony, his testimony would

11

have been prohibited under Rule 606(b)(1), and it would not have fit within either of Rule 606(b)(2)'s exceptions. That is, such testimony would not have concerned any "*extraneous prejudicial information*" that was "brought to the jury's attention" or any "*outside* influence" that was "brought to bear on any juror." MRE 606(b)(2) (emphasis added). Rather, *the jurors themselves observed* that Ellzey did not testify *during trial*. *Gleeton v. State*, 716 So. 2d 1083, 1088-89 (¶¶19-21) (Miss. 1998) (holding that jurors' alleged discussion of the defendant's failure to testify was not "extraneous prejudicial information" or an "outside influence" under Rule 606(b)), *superseded by rule on other grounds as stated in Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 35, 39 (¶¶5, 22) (Miss. 2003). "Because the juror did not learn of [Ellzey's] failure to testify through improper channels, a juror's discussion regarding this fact does not fall within either Rule 606(b) exception." *United States v. Kelley*, 461 F.3d 817, 832 (6th Cir. 2006) (collecting cases holding that jurors' statements about the defendant's failure to testify are inadmissible under Rule 606(b)); *accord, e.g.*, *United States v. Torres-Chavez*, 744 F.3d 988, 998 (7th Cir. 2014) (holding same and "join[ing] every other circuit court to consider the issue");[8] *see also Spicer v. State*, 973 So. 2d 184, 205-06 (¶¶76-77) (Miss. 2007) (holding that testimony that jurors "considered [the defendant's] silence at trial as indicative of guilt" or "as a factor during deliberation" would be inadmissible under Rule 606(b)). It necessarily follows that the trial

---

[8] As relevant here, Federal Rule of Evidence 606(b) and Mississippi Rule 606(b) are identical. *See Gladney*, 625 So. 2d at 416, 420 ("[W]e . . . look to the guidelines from the federal courts [that] have interpreted Fed. R. Evid. 606(b)," "which is identical to the Mississippi Rule."); *Martin v. State*, 732 So. 2d 847, 851 (¶19) (Miss. 1998) ("Mississippi Rule of Evidence 606(b) . . . is identical to the federal rule," and "it is proper and helpful to look to federal decisions and to how those courts have dealt with [similar] situations . . . .").

12

court did not abuse its discretion by denying Ellzey's post-trial motion as it related to this allegation. The "duty to hold an evidentiary hearing does not extend into matters which are barred from inquiry under [R]ule 606[(b)](2). And the jury's consideration of [Ellzey's] failure to testify was clearly barred from inquiry under that rule." *State v. Stricklin*, 861 N.W.2d 367, 390-91 (Neb. 2015) (applying Nebraska's substantially similar rule).

¶22. We now address Ellzey's allegation that Beverly said that Walters said that an unnamed "juror told the jury during deliberations that her husband work[ed] at either Forrest General Hospital or South Central Regional Medical Center and . . . shared her husband's belief that 'DHS always drops the ball.'" The trial court found "that this alleged comment [was] hearsay on multiple levels and there [was] no way to determine if this alleged comment from the juror was in fact made." The trial court also found that even if the comment "was actually made," it was simply "part of that juror's 'personal knowledge and experience' and not the sort of outside influence contemplated by Rule 606(b)(2)." (Quoting *Perkins v. Dauterive*, 882 So. 2d 773, 782 (¶33) (Miss. Ct. App. 2004)). On the record before us, we cannot say that the trial judge's ruling was an abuse of discretion.

¶23. "[J]urors are permitted to bring some degree of personal knowledge and experience into the deliberation process without jeopardizing their verdict." *Perkins*, 882 So. 2d at 782 (¶33). Indeed, as in most cases, the jury in this case was instructed, "You are . . . permitted to draw such reasonable inferences from the evidence as seem justified *in the light of your own experience*." (Emphasis added); *accord Owens v. State*, 383 So. 3d 305, 309 n.5 (Miss. 2024); Mississippi Model Jury Instructions (Criminal) § 1:2 (Miss. Jud. Coll. 2023-2024 ed.).

13

In *Perkins*, a medical malpractice case, a juror who was a nurse allegedly stated during deliberations "that she was familiar with what doctors go through and . . . that the doctor would lose his medical license or have his license suspended" if the jury returned a verdict for the plaintiffs. *Perkins*, 882 So. 2d at 780 (¶23). She also allegedly urged her fellow jurors to "vote for the [d]efendant" "for that reason." *Id.* Nonetheless, this Court held that the juror's alleged statements were not the sort of "extraneous information" that would warrant an investigation under *Gladney*. *See id.* at 780-83 (¶¶23-33).[9]

¶24. In the present case, the unnamed juror's alleged statement about DHS's competence does not involve "extraneous prejudicial information" admissible under Rule 606(b). The juror's belief or opinion that "DHS always drops the ball" does not involve any extra-record facts about Ellzey or about this case. Rather, it is simply a general belief or opinion about the competence of a government agency. Therefore, the trial judge did not abuse his discretion by finding that the alleged statement was simply "part of that juror's 'personal knowledge and experience' and not the sort of outside influence contemplated by Rule 606(b)(2)." (Quoting *Perkins*, 882 So. 2d at 782 (¶33)).

### III.  Cross-Examination and Impeachment of Henry

---

[9] *See also, e.g.*, *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1223 (10th Cir. 2005) ("Here the alleged 'extraneous prejudicial information' was the juror's personal experience with training police dogs. A juror's personal experience, however, does not constitute 'extraneous prejudicial information.'"); *Bethea v. Springhill Mem'l Hosp.*, 833 So. 2d 1, 8-9 (Ala. 2002) (holding that jurors' discussion of their own "personal experiences with the use of [a drug] in induced labor[ was] not extraneous information under the exception to Rule 606(b)"); *State v. Casey*, 479 N.W.2d 251, 253 (Wis. Ct. App. 1991) (holding that a juror's discussion of her "own experience as a victim of sexual assault and her opinion regarding the reason a victim of sexual assault may not come forward" was "not extraneous prejudicial information").

14

¶25.   Next, Ellzey claims that the trial court erred by (1) limiting his cross-examination of Henry and (2) preventing him from impeaching Henry with Henry's testimony from Ellzey's first trial.  We review the trial court's rulings admitting or excluding evidence or limiting the scope of cross-examination only for an abuse of discretion.  *Thornton v. State*, 905 So. 2d 745, 746 (¶5) (Miss. Ct. App. 2004).

¶26.   At trial, Henry testified that while he and Mary were returning from a hunting trip in 2016, Mary told him that she was finally ready to talk to someone about what Ellzey had done to her.  On cross-examination, Ellzey attempted to impeach Henry by showing that he had not mentioned the hunting trip when he testified in Ellzey's first trial.  But when questioned by Ellzey's counsel, Henry testified that he did not know whether he had mentioned the hunting trip in his prior testimony.  Ellzey's attorney then asked, "Well, if I told you [that] you make no mention of it in your prior testimony, would you agree or disagree?"  Henry again responded, "I don't know."  The State then objected that Ellzey was "essentially try[ing] to impeach the witness on something that may not have even been asked of him at the prior testimony."  The trial court found that "I don't know" was "a sufficient answer" to the question and sustained the State's objection.  Ellzey's attorney then moved on to another line of questioning.  Counsel did not attempt to refresh Henry's recollection with a transcript of his prior testimony, introduce Henry's prior testimony as evidence, or make a proffer.  Nonetheless, Ellzey now argues that the trial court (1) impermissibly limited his cross-examination of Henry and (2) erred by not permitting Ellzey to introduce Henry's prior testimony as extrinsic evidence of a prior inconsistent statement.

15

¶27. Both arguments are without merit. Ellzey's claim that the trial court impermissibly limited his cross-examination of Henry misunderstands the trial court's actual ruling. The court ruled that Ellzey could not simply continue to ask Henry whether he had mentioned the hunting trip in his prior testimony once Henry had made clear that he did not remember. The court did *not* prevent Ellzey from attempting to refresh Henry's recollection with a transcript. Nor did the court prohibit Ellzey from seeking to impeach Henry with his prior testimony. The court simply ruled that Ellzey could not continue asking a question the witness had already answered. In addition, Ellzey's argument that the trial court erred by not permitting him to introduce Henry's prior testimony is procedurally barred because Ellzey made no attempt to introduce the prior testimony. *Flora v. State*, 925 So. 2d 797, 807 (¶23) (Miss. 2006) (holding that an alleged error in the exclusion of evidence was "procedurally barred" when defendant "never attempted to" introduce the evidence). This issue is also waived because Ellzey failed to make a proffer of Henry's prior testimony. *Lloyd v. State*, 755 So. 2d 12, 14 (¶9) (Miss. Ct. App. 1999) ("When a trial court prevents the introduction of certain evidence, it is incumbent that a proffer be made of the potential testimony of the witness or the point is waived for appellate review."). Accordingly, this issue is without merit.

### IV.    Mary's Counseling Records

¶28. In June 2018, Mary began seeing Nina McGinnis West for counseling. Prior to Ellzey's second trial, he filed a motion to exclude West from testifying as an expert witness, arguing that the State had failed to timely or adequately disclose her proposed testimony or qualifications. Ellzey's motion also contained a single, conclusory assertion that "[a]ny

16

statements made to [West] by [Mary] are hearsay and do not fall within any exceptions." The trial court initially excluded West from testifying as an expert because she had not been timely disclosed, but the court ruled that Mary's statements to West would "be admissible subject to the declarant's motive in making the statement being consistent with the purpose of promoting treatment; and the content of the statement being such as is reasonably relied on as well as the other prerequisites for admission of the statement of Rule 803(4)." In other words, the court ruled that West could testify about Mary's out-of-court statements "subject to" the State laying an adequate foundation that the statements were admissible under the exception to the hearsay rule for statements made for the purpose of medical diagnosis or treatment. *See* MRE 803(4).

¶29. After Ellzey's second trial was delayed more than two years, the State again designated West as an expert witness. In response, Ellzey filed a motion to compel enforcement of the court's ruling preventing West from testifying as an expert. The trial court denied Ellzey's motion, reconsidered its prior ruling, and ruled that the State could offer West as an expert subject to challenge under the *Daubert*/*McLemore* standard.[10] Nevertheless, when the case proceeded to trial, the State called West only as a fact witness and did not seek to qualify her as an expert. West testified Mary told her that Ellzey had sexually abused her, that Mary sought counseling for the trauma resulting from that abuse, and that she (West) kept records of their counseling sessions. West's records were admitted

---

[10] *McLemore*, 863 So. 2d at 35 (¶5) (adopting the standard for the admissibility of expert testimony set out in *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), as modified by *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)).

17

into evidence without a contemporaneous objection by Ellzey.[11]

¶30.    Ellzey now argues that the trial court erred by admitting West's records into evidence because they contained hearsay and victim-impact evidence.  The State responds that Ellzey waived these issues by failing to object at trial, but Ellzey argues that his pre-trial motion to exclude West's testimony preserved the issues.

¶31.    A pretrial ruling on a motion in limine may be sufficient to preserve an issue for appeal if the pretrial ruling is "definitive."  MRE 103 advisory committee note.  However, if the pretrial ruling is "provisional" or tentative, a contemporaneous objection at trial is required to preserve the issue.  *Id.*  A contemporaneous objection is also necessary "[i]f the relevant facts and circumstances change materially after the [pretrial] ruling has been made."  *Id.*  "Similarly, if the court decides in [a pretrial] ruling that proffered evidence is admissible subject to the eventual introduction by the proponent of a foundation for the evidence, and that foundation is never provided, the opponent cannot claim error based on the failure to establish the foundation unless the opponent calls that failure to the court's attention by a timely motion to strike or other suitable motion."  *Id.*

¶32.    We conclude that Ellzey waived any hearsay objection to West's records.  Ellzey's pretrial motion in limine raised a hearsay objection only once in passing, and the trial court's ruling on that motion expressly stated that any statements that Mary made to West would "be admissible [at trial] *subject to the declarant's motive in making the statement being consistent with the purpose of promoting treatment; and the content of the statement being*

_____

[11] By agreement, the State redacted references in West's records to Mary having experienced a "repressed memory."

18

*such as is reasonably relied on as well as the other prerequisites for admission of the statement of Rule 803(4).*" (Emphasis added). In other words, the trial court simply made a pretrial ruling that Mary's out-of-court statements would be admitted at trial *if* the State laid an adequate foundation for admitting the statements under the relevant exception to the hearsay rule. As stated above, if a trial court rules prior to trial that certain "evidence is admissible subject to the eventual introduction by the proponent of a foundation for the evidence," the opponent *must* make a contemporaneous objection on that ground when the evidence is offered at trial. MRE 103 advisory committee note. Because such a pretrial ruling does not finally or definitively establish that the evidence is admissible at trial, the failure to make a contemporaneous objection at trial waives the issue. Accordingly, Ellzey's hearsay argument is procedurally barred on appeal.

¶33. In addition, Ellzey has waived any objection to what he now terms victim-impact evidence. Ellzey's motion in limine did not object to West's records on the ground that they contained impermissible victim-impact evidence, nor did Ellzey object to their admission at trial. Therefore, that issue is also procedurally barred. *See, e.g.*, *Fleming v. State*, 604 So. 2d 280, 292 (Miss. 1992) ("[A]n objection on one or more specific grounds constitutes a waiver of all other grounds."); *Smith v. State*, 986 So. 2d 290, 295 (¶13) (Miss. 2008) ("This Court cannot find that a trial judge committed reversible error on a matter not brought before him or her to consider.").

¶34. Although he has failed to preserve either issue for appeal, Ellzey argues that the trial court committed "plain error" by admitting hearsay and victim-impact evidence. Ellzey

19

primarily takes issue with one particular document in West's records—a letter Mary handwrote to the "Judge and Jury," apparently as a therapeutic exercise. In the letter, Mary stated that Ellzey's abuse had "shattered" her "heart and soul" and that Ellzey had "betrayed [her] as a stepfather and made [her] feel unworthy and unloved," "robbed [her] of a childhood," and "left [her] with scars that will" never heal. Mary's letter stated that she "came forward hoping to protect other children" because "[n]o child deserve[d] to go through what [she had] gone through or feel the way [she] felt." Mary stated that she "pray[ed]" that the jury could "see the potential threat that [Ellzey] is to other children" and "the manipulation he use[d] to cover up his wrongdoings." The letter closed, "If he is given a not guilty verdict, then he is free, but I will never be free from the sexual abuse he put me through." The letter was not read during trial; rather, it was simply admitted into evidence as one of nineteen pages of West's records.

¶35. In general, hearsay and victim-impact evidence are inadmissible during the guilt/innocence phase of a trial. MRE 802; *Havard v. State*, 928 So. 2d 771, 792 (¶37) (Miss. 2006) ("Victim impact evidence is admissible at sentencing, though not at the culpability phase of trial."). But the admission of such evidence in the absence of an objection is not "plain error." "Plain-error review is properly utilized for correcting *obvious* instances of injustice or misapplied law." *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016) (quotation marks omitted). Therefore, "in order to determine if plain error has occurred, we must determine *if the trial court has deviated from a legal rule*" and "whether that error is plain, clear, or obvious." *Id.* (emphasis added) (brackets and quotation marks omitted). There is

20

no "legal rule" that requires trial judges to sua sponte exclude evidence in the absence of an objection.[12]  Indeed, a trial judge will be hesitant to object to evidence sua sponte because "whether to object is a decision left to the discretion of counsel, who may have strategic reasons for not objecting."  *Graham*, 264 So. 3d at 821 (¶8) (quoting *Shaheed*, 205 So. 3d at 1112 (¶21) (brackets omitted)).  Here, Mary's letter would not have been admissible if Ellzey timely objected to it.  However, Ellzey failed to raise this objection at trial.  And as far as we can determine, the letter—which was simply one page of a nineteen-page exhibit—was never discussed during trial or brought to the trial judge's attention.  Because no legal rule required the trial judge to sua sponte exclude or limit the introduction of West's records, Ellzey cannot show that "plain error" occurred.

## V.     Daniel Dooley's Testimony

¶36.    Ellzey next complains that the trial court erred by allowing Daniel Dooley, a forensic interviewer, to vouch for or bolster Mary's credibility.[13]  Specifically, Ellzey argues that the

---

[12] *Adams v. State*, 350 So. 3d 1116, 1124 (¶23) (Miss. Ct. App. 2022) ("[N]o 'legal rule' required the trial judge to act sua sponte to exclude [a co-defendant's testimony about his guilty plea] in the absence of an objection by [the defendant]."); *Graham v. State*, 264 So. 3d 819, 821 (¶8) (Miss. Ct. App. 2018) ("With regard to hearsay evidence, we have held that there can be no plain error because no legal rule requires a trial judge to exclude hearsay in the absence of an objection, and trial judges are not expected to strike or exclude hearsay sua sponte." (quotation marks and brackets omitted)); *Demorst v. State*, 228 So. 3d 323, 328 (¶9) (Miss. Ct. App. 2017) (stating that the admissibility of in-court identification testimony and out-of-court identification evidence was "particularly unsuited for plain error review—we are aware of no legal rule requiring a trial court to sua sponte suppress evidence"); *Shaheed v. State*, 205 So. 3d 1105, 1112 (¶21) (Miss. Ct. App. 2016) ("No 'legal rule' requires a trial judge to exclude hearsay in the absence of an objection.").

[13] At trial, Ellzey stipulated that the video of Dooley's interview of Mary could be admitted into evidence.

following testimony by Dooley was improper:

> Q:    [I]n your expert opinion, based on your training and experience in forensic interview and specifically child abuse forensic interview, do you believe that [Mary's] interview is consistent with a child who has been sexually abused?
>
> A:    Consistent with child sexual abuse interview? Yes, I do. Based on my interviews I've done, there's—there's a lot of similarities in the interviews.

However, Ellzey failed to object to this testimony at trial. Therefore, the issue is waived. *See, e.g.*, *Johnson v. State*, 477 So. 2d 196, 214 (Miss. 1985) (The "failure to object to testimony waives any assignment of error on appeal."); *see also Bishop v. State*, 982 So. 2d 371, 381 (¶33) (Miss. 2008) ("[I]t is within the scope of permissible testimony for an expert to testify regarding his or her opinion that the alleged victim's characteristics are consistent with a child who has been sexually abused.").

### VI.    Madison's "Speculative Testimony"

¶37.    Ellzey next argues that the trial court erred by allowing investigator Tonya Madison to give "speculative testimony" over Ellzey's objection. Specifically, Madison was asked, "Based on your investigation and your knowledge of all of the statements that have collectively been a part of your investigation, do you have any reason to believe that [Mary] was being forced to report these allegations by her mother?" Madison answered, "No." Ellzey argues that Madison lacked sufficient personal knowledge to answer the question because her role in the investigation was limited to reviewing Mary and Jane's written statements, scheduling Mary's forensic interview, and preparing affidavits and warrants. For this reason, Ellzey argues that Madison's testimony "was highly speculative, not based on

22

any personal knowledge, and . . . an impermissible attempt to bolster [Mary's] credibility."

¶38. Under Mississippi Rule of Evidence 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." MRE 602. In her testimony, Madison described her role in the investigation and stated that she had no reason to believe Jane had forced Mary to make allegations against Ellzey. Madison had sufficient personal knowledge to answer the question posed to her. She simply stated that she was not aware of any evidence that Mary had been "forced" to accuse Ellzey of abuse. The extent of Madison's personal knowledge—and the significance of her answer—may be debatable, but she certainly had enough knowledge to answer the question. Therefore, the trial court did not abuse its discretion by overruling Ellzey's objection.

## VII. Hearsay

¶39. Ellzey next complains that the trial court erred by allowing Henry to offer hearsay testimony regarding when he first learned that there might be "some problem that had to do with [Ellzey]." Henry testified as follows:

> Q: . . . When did you first learn that there may be some problem that had to do with the defendant?
>
> A: I was first informed in February of 2014.
>
> Q: How did you learn that information?
>
> A: [Mary's] mom told me.
>
> Q: Now what do you recall being the problem at that time in February of 2014?

A:     Okay.  Her mother informed me—

MR. FARRIS:     I'm going to object to the hearsay.

MS. SUMRALL:    Your Honor, it's not offered for the truth.

THE COURT:      Well, what is the purpose that it's offered for?

MS. SUMRALL:    To tell the story of [Mary] reporting.

THE COURT:      Just to report—present what [Mary] said?

MS. SUMRALL:    Correct.  Not that [Mary] is being truthful, just telling the story of how she reported and when she reported.

THE COURT:      All right.  I'll allow it.

Q:     So go back and tell us what it is that you learned from—

A:     Okay.

Q:     —[Jane].

A:     [Jane]—[Jane] informed me that [Mary] had informed her that there was a problem between her and [Ellzey], and that he had inappropriately touched her.  Now, she wouldn't expand on—on that to her mom at that point.  So that's essentially all I knew.

The prosecutor then asked Henry "what [he and Jane] did next."  Henry testified that his "first priority was to make sure [Mary] was safe" and that she would not "have any contact" with Ellzey.  Henry then wanted to try "to get [Mary] to talk to somebody" because she "wouldn't talk to" him or Jane.  "So [Henry] made an appointment [at Forrest General Hospital] to see if [Mary] would talk to somebody and open up about it."  On appeal, Ellzey argues that the trial court abused its discretion by admitting hearsay.  The State responds that Henry's testimony was not offered to prove the truth of the matter asserted (that Ellzey "had

24

inappropriately touched" Mary) but only to tell the story of Mary's reporting the abuse and to explain the steps that were taken as a result of Mary's report.

¶40. The trial court did not abuse its discretion by overruling Ellzey's objection. A statement is not hearsay if it is not offered "to prove the truth of the matter asserted." MRE 801(c)(2). Henry's testimony regarding what Jane told him was not hearsay because the statement was offered not for its truth, but to "tell the story of [Mary] reporting." *See Ellis v. State*, 21 So. 3d 669, 673 (¶16) (Miss. Ct. App. 2009) ("[W]e find that this specific testimony was simply offered to give the complete story of the incident and was not hearsay, as it was not offered to prove the truthfulness of the assertions."). The testimony was also offered to show why Henry did what he did next—why he made an appointment for Mary at Forrest General Hospital. *See Dunn v. State*, 111 So. 3d 114, 116 (¶7) (Miss. Ct. App. 2013) (holding that testimony was "not hearsay" because it "was offered to show the effect [of the out-of-court declarant's] statements on [the hearer/witness] and her actions thereafter"); *cf. Dukes v. State*, 369 So. 3d 553, 562-63 (¶35) (Miss. 2023) ("When an officer's testimony is being used to explain why he did what he did in the course of his investigation, not to prove the truth of the matter asserted, then the testimony is not hearsay and is therefore admissible."). Because Henry's testimony about what Jane told him was not offered for the truth of the matter asserted, it was not hearsay.

## VIII. Henry's "Speculative Testimony"

¶41. Ellzey next argues that the trial court erred by allowing Henry to offer speculative testimony regarding Mary's state of mind when she was interviewed by DHS at her school.

25

On direct examination, Henry testified as follows:

> Q: So what did you think about DHS?
>
> A: Well, the DHS—I was never informed by any—I was never contacted by DHS, so that was kind of bizarre I thought. And it was very frustrating when I found out that DHS pulled [Mary] out of class and never informed me about it. *She was scared to death, I'm sure.*
>
> MR. FARRIS: I'm going to object to the speculation.
>
> THE COURT: Sustained.

(Emphasis added). Ellzey compares the above testimony and ruling to what he claims was an erroneous ruling on his objection to similar testimony on cross-examination, which was as follows:

> Q: Okay. And were you aware that [Mary] told the DHS worker that he did not hurt her? He did not—
>
> A: Again, DHS didn't contact me. Okay. And I have a problem with that. I want to know why they didn't contact me. I don't know why they didn't. If [Mary] told the DHS lady that, it would not surprise me. [Mary] was pulled out—apparently pulled out of class without her mom or dad present, scared to death, I'm sure.
>
> MR. FARRIS: I'm going to object to the conjecture.
>
> THE COURT: Overruled.

(Emphasis added). Ellzey argues that the trial court erred by overruling his objection to Henry's testimony on cross-examination after sustaining his objection to similar testimony on direct examination. According to Ellzey, the admission of Henry's statement that Mary was "scared to death" "deprived [him] of a fundamentally fair trial." We disagree.

¶42. "A trial court's admission of testimony is reviewed for an abuse of discretion."

26

*Chaupette v. State*, 136 So. 3d 1041, 1045 (¶7) (Miss. 2014). Moreover, even if we find that the trial court abused its discretion, "we may reverse a case only if[] the admission or exclusion of evidence results in prejudice and harm or adversely affects a substantial right of a party." *Id.* (quotation marks omitted). "We will not reverse a conviction based on a harmless error." *Id.* at 1047 (¶12). Even assuming that the trial judge should have sustained Ellzey's objection, we do not see how Ellzey was prejudiced by Henry's assumption that his daughter was "scared to death" when DHS questioned her in 2014. Without any showing of prejudice to Ellzey, the trial court's ruling was, at most, harmless error.

### IX. Henry's Vouching for Mary's Credibility

¶43.    Ellzey next argues that the State impermissibly asked Henry questions to bolster Mary's credibility. Specifically, Ellzey takes issue with the following testimony:

> Q:    Now, we're here five years after the sheriff's department investigated, and twelve years after the abuse allegedly began. Do you have any reason at all to believe that [Jane] put [Mary] up to fabricating these allegations for custody or divorce?
>
> A:    No. I have no reason to believe that. And it—it—if that was the case, [Mary] wouldn't do—she would laugh at that. No way she would do that. Good Lord, no.
>
> Q:    Knowing [Mary] as her father, do you have any reason to believe that [Mary] would ever go along with a scheme like defense counsel is trying to get the jury to believe?
>
> MR. FARRIS:    I'm going to object—
>
> THE WITNESS:    No.
>
> MR. FARRIS:    —to that comment, Your Honor.
>
> THE COURT:    Overruled.

27

. . . .

THE COURT:        Let's reask that question and put the question mark after scheme.

MS. SUMRALL:    Sure.

BY MS. SUMRALL:

Q:    Knowing [Mary] as her father, do you have any reason to believe that [Mary] would ever go along with such a scheme?

A:    No.  I have no reason to believe that.

Ellzey contends that this testimony "rendered [his] trial fundamentally unfair and denied him due process."

¶44.    However, Ellzey failed to object to the first question or Henry's answer.  Therefore, any objection to that portion of Henry's testimony is waived.

¶45.    Moreover, Ellzey's only objection to the prosecutor's second question was a non-specific objection "to that comment."  In context, it appears that Ellzey objected to the argumentative part of the question—i.e., "like defense counsel is trying to get the jury to believe."  The trial court effectively sustained that objection by directing the prosecutor to rephrase her question without the comment to which Ellzey apparently objected.  Ellzey made no further objection to the rephrased question, nor did he ask for the court to instruct the jury to disregard the original question.  Accordingly, we conclude that any objection to the prosecutor's second question is also waived.  *See Keys v. State*, 33 So. 3d 1143, 1149 (¶¶20, 22) (Miss. Ct. App. 2009) (holding that when the State rephrased its question in response to an objection, and the defendant "did not object to the rephrased question," "the

28

issue [was] waived for purposes of appeal"); *Cotton v. State*, 675 So. 2d 308, 315 (Miss. 1996) ("Because the defense failed to request that the jury be admonished, the sustaining of the objection was sufficient to prevent reversible error. There is no reversible error where the court did all that it was asked to do." (citation omitted)).

¶46. Moreover, notwithstanding Ellzey's waiver, we find nothing improper about these two questions. The clear and overriding theory of Ellzey's defense from his opening statement through closing argument was that Jane had caused Mary to make false allegations against him to prevent him from obtaining custody of Meredith. Given Ellzey's theory of a long-running scheme against him, the State was entitled to ask Mary's father whether he had any reason to believe that Jane had caused Mary to fabricate the allegations or that Mary had in fact done so. Henry was not "vouching" for the credibility of Mary's testimony at trial. Rather, he was simply testifying as a fact witness regarding the lack of evidence to support Ellzey's allegation that Jane and Mary were colluding against him.

### X.    Closing Argument

¶47. Ellzey next argues that the prosecutor impermissibly commented on his decision not to testify during the State's closing argument. However, because Ellzey "did not object to the alleged improper statements, the assignment of error has been waived[,] and his arguments are barred procedurally on appeal." *Ambrose v. State*, 254 So. 3d 77, 129 (¶163) (Miss. 2018). "[T]he failure to object contemporaneously generally waives a claim of prosecutorial misconduct during closing argument," and "we will review such a claim [only] if the prosecutor's statement was *so inflammatory that the trial judge should have objected*

29

*on his own motion*." *O'Connor v. State*, 120 So. 3d 390, 399 (¶26) (Miss. 2013) (emphasis

added). Under the "so inflammatory standard," reversal is warranted only "in extreme cases"

where there has been a "most extreme and intolerable abuse" of the wide latitude afforded

to counsel during closing arguments. *Ambrose*, 254 So. 3d at 130 (¶166).

¶48.    Procedural bar notwithstanding, the State did *not* comment on Ellzey's failure to

testify at trial. Rather, the State commented on Ellzey's reaction and responses to questions

during his recorded interview with Myers. Ellzey voluntarily consented to that interview,

which was played for the jury at trial and admitted into evidence. The relevant portion of the

State's closing argument went as follows:

> And I want you to think too in that video just about whether some of the
> comments that he made make sense based on what was happening at the time.
> This man has been arrested for molesting his stepdaughter, not once, but
> multiple, countless [times] . . . . That's what he's in that room for. . . . He
> alleges that he's an innocent man. And Captain Myers tells him a story about
> a guy who was accused of similar things . . . . But Captain Myers says, I once
> worked a case with a guy who was sort of in your position, and we talked
> about it, and that guy eventually realized that he wanted to make things right
> and try to make the child whole, and he came clean. And he said what he did,
> and I think it helped the child a lot. And the defendant's reaction to this story
> about this other guy who's sort of done the same thing is, What
> happened—what happened to him? Where did he end up? What? You're
> here being accused of being a child molester, and you comment to this whole
> soliloquy about a guy who admits to molesting a child is, Well, where did he
> end up? Whatever happened to him? Guys, if you're innocent, if you're
> wrongfully accused, you don't care. There is no amount of stories that Myers
> could tell you that would make you not say in a pretty enraged way, I didn't do
> this. You can tell me all the stories you want. I don't care. . . .

> You want me to let you know why I think he wanted to know where that
> guy ended up? It's because he had something in common with him. At the
> end sort of the video, Captain Myers comes back in . . . , and he says, What do
> you think should happen to someone who would molest a child? And the
> defendant says, I—I don't know. What do you mean? And Myers says, Well,

30

It's not a real hard question. Just what do you think should happen to somebody that would molest a child? Psychological help.

Counsel opposite has made a whole bunch of comments about all the things that [Mary] didn't say or when she didn't say things. **I want to talk to you about what the defendant didn't say.** When he's asked what should happen to someone who would molest a child, he says, They should get psychological help. . . . He doesn't say they should be punished. He doesn't say they should go to jail. He doesn't say what I think my husband and dad and brothers would say, which is, Twenty minutes locked in a room with her father. **Guys, that's not the reaction of an innocent man.**

(Emphasis added). Ellzey also objects to a portion of the State's rebuttal closing argument, where the State argued as follows: "Go back and watch the defendant's interview. Think through as hard as you can everything you've seen and heard. **The defendant did not respond in the way that an innocent man would. And [Mary] has never wavered.**" (Emphasis added).[14] Ellzey argues that the emphasized statements by the prosecutor were improper comments on his decision to exercise his right not to testify.

¶49. The defendant's right not to testify is protected by the Fifth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, and Article III, Section 26 of the Mississippi Constitution. *Jones v. State*, 669 So. 2d 1383, 1390 (Miss. 1995). "In order to protect this right, prosecutors are prohibited from making direct comments on the defendant's failure to testify; they are also precluded from referring to the defendant's failure to testify by innuendo and insinuation." *Id.* (quotation marks omitted). In addition, "[i]t is improper and, ordinarily, reversible error to comment on the accused's [post-arrest,] post-*Miranda* silence. The accused's right to be silent then is equally as strong

---

[14] The sentences that are emphasized in the text are also emphasized in Ellzey's appellate brief as the allegedly improper comments in the State's closing argument.

31

as the right not to testify and it is error to comment on either." *Swinney v. State*, 241 So. 3d 599, 608 (¶29) (Miss. 2018) (quoting *Quick v. State*, 569 So. 2d 1197, 1199 (Miss. 1990)).

¶50. But in this case, the prosecutor was not commenting on Ellzey's constitutionally protected decision not to testify. Post-arrest, Ellzey did not remain silent; rather, he voluntarily waived his right to remain silent and agreed to talk with Myers. The video of the interview was admitted into evidence at trial. In her closing argument, the prosecutor properly commented on that evidence, including Ellzey's own voluntary statements, answers, and reactions to Myers's questions. Obviously, "prosecutors have a right to comment on the evidence" presented at trial. *Robinson v. State*, 247 So. 3d 1212, 1231 (¶47) (Miss. 2018). A prosecutor is also "entitled to argue [her] case drawing all rational inferences which come from the evidence presented in the courtroom." *Caston v. State*, 823 So. 2d 473, 495-96 (¶72) (Miss. 2002) (quoting *Bell v. State*, 725 So. 2d 836, 861-62 (Miss. 1998)).

¶51. "What constitutes an improper comment on the defendant's failure to testify is to be determined from the facts and circumstances of each case." *Jones*, 669 So. 2d at 1390 (quotation marks omitted). This issue in this case is not close. In context, it is evident that the prosecutor commented on the evidence—Ellzey's voluntary interview—and inferences that reasonably could be drawn from it. Accordingly, this issue is without merit.

## XI. Ineffective Assistance of Counsel

¶52. On appeal, Ellzey argues that his trial counsel provided ineffective assistance by failing to object to (1) the admission of West's records, (2) the State's closing argument, and

(3) the State's cross-examination of Diara Thompson.[15] "Generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020) (brackets omitted). "This Court will address such claims on direct appeal when [1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id.* (brackets omitted). "This Court has also resolved ineffective-assistance-of-counsel claims on direct appeal when the record affirmatively shows that the claims are without merit." *Id.* However, "[i]t is unusual for this Court to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal. This is because we are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim." *Aguilar v. State*, 847 So. 2d 871, 878 (¶17) (Miss. Ct. App. 2002). If the record on direct appeal is insufficient to address the defendant's ineffective assistance claims, we will "dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction relief." *Sandlin v. State*, 156 So. 3d 813, 819 (¶20) (Miss. 2013).

---

[15] Thompson, a defense witness, testified that in 2014 she investigated an allegation that Ellzey had sexually abused Mary, but Thompson found that the allegation was "unsubstantiated" because she "found no evidence to support the allegations of sexual abuse." On appeal, Ellzey argues that his trial counsel provided ineffective assistance by not objecting when the State cross-examined Thompson about her failure to comply with a policy in effect at the time of trial that required CPS to report allegations of sexual abuse to law enforcement. Ellzey argues that his trial counsel should have objected because the record does not show whether that policy was also in effect when Thompson conducted her investigation in 2014. Ellzey argues that counsel's failure to object to this line of cross-examination undercut Thompson's credibility.

¶53. Here, for the reasons discussed above, the State's closing argument was not improper. Therefore, Ellzey's trial counsel did not provide ineffective assistance by not objecting to it. "The 'failure to raise meritless objections is not ineffective lawyering; it is the very opposite.'" *Carruthers v. State*, 348 So. 3d 1042, 1049 (¶15) (Miss. Ct. App. 2022) (brackets omitted) (quoting *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)).

¶54. We conclude that the record is insufficient to address the remainder of Ellzey's ineffective assistance claims. As noted above, we are strictly "limited to the trial court record," which "is usually insufficient . . . to evaluate [a] claim" of ineffective assistance. *Aguilar*, 847 So. 2d at 878 (¶17). As is usually the case, the remainder of Ellzey's ineffective assistance claims would be "more appropriate[ly raised] in a motion for post-conviction relief." *Sandlin*, 156 So. 3d at 819 (¶20). Therefore, we "dismiss [those] claims without prejudice, preserving [Ellzey's] right to raise the claims later in a properly filed motion for post-conviction relief." *Id.*

## XII. Cumulative Error

¶55. Ellzey's final argument is that his conviction should be reversed based on cumulative error. "The cumulative-error doctrine holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Powers v. State*, 371 So. 3d 629, 719 (¶380) (Miss. 2023) (quotation marks omitted). However, Ellzey has identified, at most, one harmless error. *See supra* Part VIII. Accordingly, this argument also fails. *Brown v. State*, 336 So. 3d 134, 147 n.14 (Miss. Ct. App. 2020) (holding

that the cumulative-error doctrine is inapplicable when the defendant identifies only one harmless error); *accord Page v. State*, 269 So. 3d 440, 455 n.13 (Miss. Ct. App. 2018); *Keys v. State*, 219 So. 3d 559, 568 n.8 (Miss. Ct. App. 2017).

**CONCLUSION**

¶56.     Ellzey's convictions and sentences are **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, SMITH, EMFINGER AND WEDDLE, JJ., CONCUR.  McCARTY, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ.**

**McCARTY, J., SPECIALLY CONCURRING:**

¶57.     Although I agree with the majority opinion that Ellzey's convictions and sentences should be affirmed, I find the extremely broad date range in this indictment troubling.  The majority focuses on the criminal procedure rules in reaching the conclusion that Ellzey's indictment was sufficient.  While I acknowledge that whether an indictment conforms to our Rules is an important consideration in determining its sufficiency, it is not the only consideration.  When analyzing the sufficiency of an indictment and whether such a date range disadvantages the defendant, we should remain focused on whether the indictment prejudices the defendant, rather than a mechanical analysis.

¶58.     "The primary purpose of an indictment is to give the defendant fair notice of the crime charged."  *Faulkner v. State*, 109 So. 3d 142, 146 (¶13) (Miss. Ct. App. 2013) (internal quotation marks omitted).  So, an indictment "must contain the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation."  *Id.*  Additionally, "[a]n indictment must contain (1) the essential elements of

35

the offense charged, (2) sufficient facts to fairly inform the defendant of the charge against which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense." *Gilmer v. State*, 955 So. 2d 829, 836-37 (¶24) (Miss. 2007) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

¶59. Because a core tenet of our jurisprudence is to safeguard a defendant from an unfair trial, our precedent repeatedly focuses on—and warns against—the impact of a broad indictment. For instance, in *Tapper v. State*, 47 So. 3d 95, 97 (¶1) (Miss. 2010), the defendant was indicted for and later convicted of two counts of sexual battery and five counts of touching a child for lustful purposes. On appeal, he argued not only that the last four counts listed in his indictment failed to adequately "notify him of the nature and cause of the accusation, rendering the indictment defective[,]" but also "that the failure of the indictment to allege more specific dates denied him the opportunity to present any defense other than denial." *Id.* at 101 (¶22).

¶60. Acknowledging that the State "narrowed the time frame to less than three months," our Supreme Court found that based on the record and testimony, "the State could not narrow the time frame or provide more specific details than it did." *Id.* at 102 (¶25); *see also Morris v. State*, 595 So. 2d 840, 842 (Miss. 1991) (finding the "victim's testimony amply illustrates the fact that the State could not narrow the time frame any more than it did"). But that was not the end of the inquiry. The Court further emphasized that "in all cases, but specifically in cases involving allegations of sex offenses committed upon minor children," specificity of the indictments is of the utmost importance. *Tapper*, 47 So. 3d at 103 (¶28); *see also*

36

*Wilson v. State*, 515 So. 2d 1181, 1183 (Miss. 1987) (recognizing that "in cases of this nature, it is important that a defendant be given the specific date or dates of the alleged acts if at all possible"). As a result, the Supreme Court expressly "implore[d] our prosecutors to be as specific as possible in drafting indictments[.]" *Id.*

¶61. These fundamental considerations guided our decision in *Shoemaker v. State*, 256 So. 3d 604, 607 (¶3) (Miss. Ct. App. 2018). A defendant was indicted for one count of sexual battery and one count of gratification of lust after his teenage step-granddaughter reported the abuse she suffered. Although the defendant's "original indictment charged him with committing the alleged crimes during a five-year time period[,]" the State amended the indictment and "narrow[ed] the identified time frame to two years." *Id.* at 611 (¶25). The amended indictment and narrowed time frame came as a result of the defendant's motion "requesting that his indictment provide more specific dates." *Id.*

¶62. Ultimately, this Court affirmed the trial court's finding that "the State could not narrow the date range provided in [the defendant's] indictment counts any more than it already did." *Id.* at 612 (¶29). Nonetheless, just as the Supreme Court in *Tapper*, we were careful to "caution prosecutors to limit the time frame provided in an indictment as much as reasonably possible to sufficiently notify defendants of the charges against them and to allow defendants the opportunity to prepare a defense." *Id.*

¶63. Therefore, we have seen a crucial pattern where our precedent repeatedly stresses the importance of specificity with respect to indictments and the date ranges within them. Precedent emphasizes that the purpose of an indictment and the accompanying considerations

of due process must remain our ultimate focus when determining its sufficiency.

¶64.    While I do not dispute the end result reached by the majority opinion, the majority concludes that "Ellzey fails to show how the State could have reasonably narrowed the alleged date range." But as *Tapper* and *Shoemaker* make clear, that is not Ellzey's job. It is the responsibility of the State to do what it can to narrow the date range, not the defendant. Due process requires more than a mere mechanical analysis of date ranges. For it is the larger framework of due process that has been the guiding consideration under our precedent, and it should remain as such.

¶65.    Here, the date range provided in Ellzey's indictment was between January 2009 and January 2014, a span of five years. Although the majority acknowledges that the date range is "broad," the majority ultimately concludes the range is "reasonable and narrow enough under the circumstances to fully and fairly inform Ellzey of the charges against him." While I agree the language of the indictment fully and fairly informed Ellzey of the charges against him, that is only part of the document's purpose. The indictment must fully and fairly inform Ellzey of the charges against him "so that he may have a *reasonable opportunity* to prepare an *effective defense*[.]" *Moses v. State*, 795 So. 2d 569, 571 (¶13) (Miss. Ct. App. 2001) (emphasis added). It is true that "Ellzey's only defense was that he was totally innocent," but in a case such as this one with a date range spanning 1,826 days, he was essentially left with no other theory of defense but a blanket denial.

¶66.    Nonetheless, due to the volume of proof in this case, I am left with the conclusion the indictment was legally sufficient under these unique facts. But this conclusion does not

38

negate the imperative need for prosecutors to remain diligent in preserving the rights afforded to each and every defendant. Indeed, our precedent has shown time and again that the only surefire way to do so is to narrow the date range in an indictment as much as reasonably possible. In doing so, we ensure a defendant the opportunity to present meaningful defenses.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**